[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14294

_____

D.C. Docket No. 4:18-cr-10012-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BRYAN EVAN SINGER,
a.k.a. Bryan Blackhart,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 26, 2020)

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

ROSENBAUM, Circuit Judge:

Fidel Castro came to power in Cuba in 1959, after overthrowing Fulgencio Batista.[1]  The following year, on October 19, 1960, the United States imposed the first trade embargo on Cuba.[2]  Though the contours of that embargo have changed over the sixty years since then, significant parts of it remain in effect through today.[3]  This case concerns Defendant-Appellant Bryan Singer's conviction for attempting to violate an aspect of that embargo that is currently embodied in the International Emergency Economic Powers Act and regulations promulgated in accordance with that Act—more specifically, a prohibition on exporting to Cuba technology that can be used for encryption capabilities and can affect United States national security and anti-terrorism efforts.

Singer argues on appeal that the government presented insufficient evidence to support his conviction for attempting to export 303 Ubiquiti NanoStation M2 Network Modems[4] ("NanoStations") to Cuba without a license.  Raising an issue of first impression, he contends that the government was required to prove he knew of

---

[1] https://www.history.com/topics/cold-war/fidel-castro (last visited June 26, 2020).

[2] https://time.com/4076438/us-cuba-embargo-1960/ (last visited June 26, 2020).

[3] *See* https://www.history.com/this-day-in-history/full-us-cuba-embargo-is-announced (last visited June 26, 2020).

[4] According to government expert Michael Pender, a senior licensing officer with the U.S. Department of Commerce's Information Technology Controls Division, a NanoStation is a communication device that uses 802.11 Wi-Fi to communicate over long distances of 1,000 feet or more at high speeds typically for business use (not for home use).  ECF No. 73 at 69. NanoStations are subject to export control to Cuba because they are able to encrypt information. Pender stated that products falling into the classification to which NanoStations are subject are controlled for both national security and antiterrorism reasons, primarily because of concern that criminals and foreign governments may use them to communicate in secret and without interception by law enforcement or the National Security Agency.  *Id.* at 70−71.

2

the facts that made the NanoStations subject to prohibitions on export to Cuba without a license. We agree. But we conclude that the jury instructions the district court gave correctly explained the level of knowledge required to convict, and the evidence admitted at trial established Singer's knowledge beyond a reasonable doubt.

We also reject Singer's claim that the evidence did not sufficiently establish that he took a substantial step towards exporting the NanoStations in violation of the law. So we affirm Singer's conviction for attempting to export NanoStations to Cuba without a license.

Singer's challenge to the district court's application of the two-point obstruction-of-justice Sentencing Guidelines enhancement fares no better. After careful consideration, with the benefit of oral argument, we therefore affirm Singer's conviction and sentence.

## I.

As we have noted, Singer was convicted of attempting to export NanoStations from the United States to Cuba. The United States government has designated NanoStations as having the potential to affect national security and anti-terrorism efforts. Singer was also convicted of lying to a special agent of the Department of Homeland Security who was attempting to ensure compliance with the laws regulating travel and exports to Cuba. So before we discuss the facts of Singer's

3

case, it is helpful to review the governing legal background.  We begin with a description of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-07, and relevant regulations promulgated in accordance with it.  Then we review the relevant rules for travel and exportation of items to Cuba.

A.    **The International Emergency Economic Powers Act and the Export Administration Regulation at Issue Here**

This case deals in part with the IEEPA and regulations promulgated under it. The IEEPA addresses the President of the United States's authority to regulate international economic transactions during wars or national emergencies.  *See* 50 U.S.C. §§ 1701-02.  Under the IEEPA, the President may declare a national emergency through executive orders that have the full force and effect of law.

The IEEPA also authorizes the President to issue regulations governing exports.  *See id.* §§ 1702(a)(1)(B), 1704.  Originally, though, the Export Administration Act, 50 App. U.S.C. §§ 4601-23, empowered the Department of Commerce to promulgate regulations to implement the Export Administration Act, which regulated the exportation of goods, technology, and software from the United States.  The Department of Commerce used that authority to issue the Export Administration Regulations, 15 C.F.R. pts. 730-774 (the "EAR"), which imposed certain restrictions on the exportation of goods, technology, and software from the United States.  *See* 15 C.F.R. § 730.2.

4

When the Export Administration Act lapsed in 2001, President George W. Bush used his authority under the IEEPA to issue Executive Order 13222. Executive Order 13222 declared that the expiration of the Export Administration Act created a national emergency resulting in an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" in the form of, in relevant part, "the unrestricted access of foreign parties to U.S. goods and technology." Exec. Order 13222, 66 Fed. Reg. 44025 (Aug. 17, 2001). To address this national emergency, under the IEEPA, President Bush ordered the EAR's provisions to remain in full force and effect, despite the expiration of the Export Administration Act. *See id.* at § 2.

Since President Bush issued Executive Order 13222, President Bush and those Presidents who have followed him have released annual Executive Notices extending the national emergency declared in Executive Order 13222 from that time through now. *See*, *e.g.*, https://obamawhitehouse.archives.gov/the-press-office/2016/08/04/notice-continuation-national-emergency-respect-export-control (last visited June 26, 2020); 82 Fed. Reg. 39005 (Aug. 16, 2017); 83 Fed. Reg. 39871 (Aug. 13, 2018); 84 Fed. Reg. 41881 (Aug. 15, 2019).

The IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [the IEEPA]." 50 U.S.C. § 1705(a). Since the President

renewed the EAR under the IEEPA, § 1705(a) makes it unlawful for a person to violate any regulation of the EAR.  And any "person who willfully commits [or] willfully attempts to commit" a violation under § 1705(a) is guilty of a federal felony.  *Id.* at § 1705(c).

As relevant here, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  In furtherance of protecting the national security, the EAR imposes licensing and other requirements for the lawful exportation from the United States of items subject to the EAR, and for their lawful re-exportation from one foreign destination to another.

The Department of Commerce identifies the most sensitive items subject to EAR controls on the Commerce Control List (or the "List"), published at 15 C.F.R. Part 774, Supp. No. 1.  It categorizes items on the List by Export Control Classification Number ("ECCN"), each of which is subject to export-control requirements, depending on the destination, end use, and end user of the item. ECCN 5A002 covers "[i]nformation security" systems, equipment, and components. *See* 15 C.F.R. pt. 774, Supp. No. 1, Cat. 5, Part 2, A.I.  This category is subject to the controls of the EAR because it includes national-security, anti-terrorism, and encryption items.  *Id.*

As relevant here, items that fall into ECCN 5A002.a.1 require a license for exportation to Cuba. *See id.*; 15 C.F.R. §§ 746.1(a)(1), 746.2(a). Because ECCN 5A002.a.1 includes NanoStations within its parameters, NanoStations may not be exported to Cuba without a license.

Besides obtaining a specific license authorizing exportation, a person seeking to ship products to Cuba must also file an Electronic Export Information through the Automated Export System. *See* 13 U.S.C. § 305(a)(1); 15 C.F.R. pt. 30 (Foreign Trade Regulations). This system "strengthens the U.S. government's ability to prevent the export of [prohibited] items to unauthorized destinations and/or end users because [it] aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation." 15 C.F.R. § 30.1(b). The Department of Homeland Security, Customs and Border Protection (the "CBP"), administers the Automated Export System.

**B.    Relevant Legal Framework for Exporting Items to Cuba**

We now turn to the relevant law as it pertains to travel and exports to Cuba. On March 1, 1996, President William J. Clinton issued Proclamation 6867, entitled "Declaration of a National Emergency and Invocation of Emergency Authority Relating to the Regulation of the Anchorage and Movement of Vessels." 61 Fed. Reg. 8843. Among other things, Proclamation 6867 empowered the Secretary of Transportation (and later, the Secretary of Homeland Security) to promulgate rules

7

and regulations governing the movement and inspection of vessels traveling from United States territorial waters into Cuban territorial waters. *See id.* § 1.

President George W. Bush expanded the scope of Proclamation 6867 when he issued Proclamation 7757 on February 26, 2004. 69 Fed. Reg. 9515. Among other things, in Proclamation 7757, President Bush reaffirmed the Secretary of Homeland Security's authority to promulgate rules and regulations controlling the movement and inspection of vessels from the United States territorial waters into Cuban territorial waters. *See id.* § 1.

In accordance with the authority afforded the Secretary of Homeland Security, the Department of Homeland Security promulgated 33 C.F.R. § 107.240, which provides that 33 C.F.R. Part 107, Subpart B, remains effective for the duration of the national emergency relating to Cuba and its attendant emergency authority, as declared in Proclamations 6867 and 7757. Among other regulations, 33 C.F.R. Part 107, Subpart B requires those leaving United States territorial waters headed for Cuban territorial waters to first obtain a written permit from the Coast Guard. *See* 33 C.F.R. § 107.215(a). Individuals apply for this permit by submitting a written application to the Coast Guard on an official form called the CG-3300. *Id.* § 107.220; ECF No. 73 at 32.

The CG-3300 warns applicants, "Failure to obtain all of the appropriate permits and licenses prior to travel to Cuba may result in felony prosecution . . . ."

ECF No. 56-1 at 17. It further informs applicants that "[d]etailed information on the U.S. embargo can be obtained from the U.S. Department of the Treasury, Office of Foreign Assets Control (OFAC)." *Id.* Among other information, the form asks applicants to state the purpose of the voyage in Cuban territorial seas. *Id.* The form also requires the applicant to certify that the information provided "is true and correct" and that he "understand[s] that willfully making a false, fictitious, or fraudulent statement or concealing a material fact in this matter can result in" imprisonment. *Id.*

Significantly, though, a permit allowing a vessel to enter Cuban territorial waters is not a license for an individual to travel to Cuba. *See* 33 C.F.R. § 107.220(c); *see also* ECF No. 73 at 33. Rather, to travel to Cuba from the United States, a person must qualify for a general license or obtain a specific license. Title 31, Code of Federal Regulations, Part 515 sets forth several general licenses covering certain types of travel to Cuba. Among these general-license provisions is 31 C.F.R. § 515.574, "[s]upport for the Cuban People." In relevant part, this provision allows those who satisfy its requirements to travel to, from, and within Cuba. *See* 31 C.F.R. § 515.560(c). But the "[s]upport for the Cuban People" general license does not authorize travel to Cuba for the purpose of exporting items from the United States to Cuba, including the NanoStations, that fall into ECCN 5A002.a.1 on the Commerce Control List. *See*, *generally*, *id*.

9

Rather, as we noted in the section above on the IEEPA, "[a]ll the items on the Commerce Control List . . . require a license to [export to] Cuba.  15 C.F.R. § 746.1(a)(1).  As the regulations explain, though, "[m]ost items [on the List] requiring a license [for export to Cuba] are subject to a general policy of denial."  *Id.*  Nevertheless, the regulations do provide a limited license exception for "[s]upport for the Cuban People" where items controlled on the Commerce Control List are involved.  Under that license exception, those items controlled for only anti-terrorism reasons may be exported.  15 C.F.R. § 740.21(b).  The "support for the Cuban People" exception expressly prohibits exportation to Cuba where "any other reason for control applies to the item."  *Id.*

As we have noted, NanoStations fall within Commerce Control List ECCN 5A002.a.1.  They are classified that way because they are considered "encryption items" with national-security *and* anti-terrorism applications.  Because they appear on the List for reasons beyond anti-terrorism, we need not consider whether they would otherwise qualify for a license exception for "support of the Cuban People" since they cannot qualify for that exception, regardless.

\* \* \* \* \*

So to recap, to export NanoStations from the United States to Cuba by sea, a person must have a valid permit to enter Cuban territorial waters and a valid license authorizing the exportation of the items to Cuba.  Neither a general license nor a

10

license exception for "support for the Cuban People" will suffice. Exportation to Cuba without a valid license authorizing that activity constitutes a violation of 50 U.S.C. § 1705(a) and, if willfully committed, is a felony, *id.* at § 1705(c). Finally, besides a valid permit and a valid license, a person traveling to Cuba to export goods must also file an Electronic Export Information through the Automated Export System. *See* 13 U.S.C. § 305; 15 C.F.R. Part 30 (Foreign Trade Regulations).

## II.

With this legal background in mind, we review the facts of this case.

On May 1, 2017, Homeland Security Investigations ("HSI") Special Agent Todd Blyth received a dispatch advising him that a man was loading items onto a boat at a marina in Key West and that the man was believed to be heading to Cuba. ECF No. 58 at 9. Blyth went to the marina to check out the situation.

There, he saw Bryan Singer, the man about whom he had received the tip. ECF No. 58 at 9-10. Eight other men were also present and apparently assisted Singer in loading several motorcycles and other equipment onto Singer's vessel, *La Mala*. *Id.* at 10.

Blyth questioned Singer about his impending trip. In response, Singer told Blyth that he was planning to transport the men, the motorcycles, and "other items on his vessel to Cuba." *Id.* Singer presented Blyth with an approved CG-3300,

11

which Singer claimed (incorrectly) permitted him to transport the men and cargo to Cuba. *Id.*

Blyth reviewed the CG-3300. It did not indicate that Singer intended to export goods to Cuba. *See* ECF No. 56-1 at 17. Rather, the CG-3300 purported to take advantage of the general license for travel to Cuba for "support for the Cuban People." *See id.* In particular, the CG-3300 specified that the purpose of Singer's voyage was for "SUPPORT OF THE CUBAN PEOPLE, FOR A MOTORCYCLE RALLY." *Id.* Singer advised Blyth that the eight men present at the marina had paid him $2,000 to transport them to Cuba. ECF No. 74 at 124-26, 127-28; ECF No. 58 at 10.

After reviewing the CG-3300, Blyth instructed Singer that the permit to enter Cuban Territorial Seas did not allow him to leave for Cuba that day but instead authorized him to depart the following day (May 2, 2017). ECF No. 58 at 10. Blyth also informed Singer that he did not have a permit or license to export items and that officers would return the following day to inspect his boat before it left for Cuba. *Id.* at 10-12. Singer did not indicate that he was confused about the warnings. *Id.* at 12. After the encounter with Blyth, the eight men took their motorcycles and left, but the other items remained onboard the boat. ECF No. 74 at 74.

The next day, May 2, 2017, Blyth and CBP officers, including Officer Scott Hatfield, returned to the dock to conduct an outbound inspection of *La Mala*. ECF

No. 58 at 12. Blyth later testified at Singer's trial that Singer again said that he had a valid CG-3300 and that he "wished to sail to Cuba." *Id.* at 13. Singer, though, asserted during trial that on May 2, he told Blyth he had canceled his trip to Cuba. ECF No. 74 at 74.

In any case, Blyth informed Singer that the officers wanted to conduct an outbound inspection of the boat, and Singer agreed. *Id.* at 74-75; ECF No. 58 at 12. During the process, the officers first asked Singer whether he had any items to declare. ECF No. 58 at 13. Singer told them he had items in plain view inside the boat's main cabin. Then Singer produced receipts for those 4 or 5 items, none of which required a specific license and the value of which totaled less than $2,500.[5] *Id.* After the officers provided Singer another opportunity to declare any other items, Singer again insisted that he did not have anything else to declare. *Id.*; ECF No. 73 at 10; ECF No. 74 at 75. Singer then allowed law enforcement to search his boat. ECF No. 58 at 13.

During the search, Hatfield discovered that the queen-sized bed in the main cabin of the boat was screwed down to the floor. ECF No. 73 at 13. Hatfield, who had searched Singer's boat on a prior occasion, remembered that the last time he examined the bed, it was not screwed down to the floor, so he asked Singer about

---

[5] A person seeking to export products that do not require a specific license must also file an Electronic Export Information through the Automated Export System if the value of the goods exceeds $2,500.00. ECF No. 73 at 140.

it.  *Id.*  Singer responded that he had sealed the bed to the floor in Cuba because the bed had been moving around too much with the ocean's motion.  *Id.*

Hatfield removed the screws and lifted the bed.  *Id.*  Under the bed, Hatfield discovered a hidden compartment that was "as full as it gets."  *Id.* at 15.  Among the items officers found in the compartment were 303 NanoStation devices and black bags containing various things like motorcycle parts, link modems, and DirecTV boxes.  *Id.* at 13-18.

According to Blyth and Hatfield, when Singer realized that the officers had found the items beneath the bed, he apologized for fabricating the story that the bed had been secured in Cuba.  *Id.* at 18; ECF No. 58 at 22.  Then Singer said he had lied because he did not want United States law enforcement to find the items.  ECF No. 73 at 18; ECF No. 58 at 22.  At trial, Singer disputed making part of this statement.  Instead, he testified that he told the officers he had hidden the items because he did not want Cuban authorities to find them.  ECF No. 74 at 72, 76-77.  After the officers discovered the items under the bed, they took custody of them as evidence.  ECF No. 58 at 22-23.

Despite the May 2 encounter, Singer sailed to Cuba the following day, on May 3, 2017, arriving on May 4, 2017.  ECF No. 74 at 78.  Singer claimed that after officers left the marina on May 2, other boaters in the marina convinced him to travel to Cuba to drop off the items that had not been seized.  *Id.* at 77-78.  Singer made

14

the trip and returned from Cuba to the United States by plane on May 5, 2017. *Id.* at 78-79.

Database checks later revealed that Singer had never applied for or obtained an export license. ECF No. 74 at 21-22. Nor had he ever filed an Electronic Export Information through the Automated Export System, as required. *Id.*

When Singer arrived at the Fort Lauderdale International Airport on May 5, 2017, Special Agent Tina Stasulli Korb from the Department of Commerce's Bureau of Industry and Security's Office of Export Enforcement met him. ECF No. 74 at 79-80. Korb had been alerted by law enforcement that Singer was flying into the United States, returning from Cuba. ECF No. 74 at 9.

When Korb encountered Singer at the airport on May 5, 2017, she interviewed him and retrieved several documents from him, including a form from the Cuban Ministry of Agriculture at the Hemingway Marina in Cuba, which was dated May 4, 2017. ECF No. 74 at 11-12; ECF No. 56-1 at 95. In that document, Singer declared that he, as captain of *La Mala*, had been notified of certain Cuban regulations. ECF No. 56-1 at 95. Singer did not dispute that he had, in fact, traveled to Cuba on May 3, 2017. Singer also told Korb that all the NanoStations found in the compartment on his boat during the May 2 outbound inspection were intended for the passengers who were supposed to travel with him to Cuba. ECF No. 74 at 150.

15

Because he did not have a license to export the 303 NanoStations, Singer was later charged with attempting to smuggle goods from the United States, "knowing [them] to be intended for exportation contrary to law and regulations of the United States, namely, [50 U.S.C. § 1705], and Section 746.2(a) of the Export Administration Regulations," in violation of 18 U.S.C. § 554(a). ECF No. 23 at 4; ECF No. 74 at 21-22. Singer was also indicted for knowingly and willfully making false statements to a Special Agent of HSI, in violation of 18 U.S.C. §1001(a)(2). ECF No. 23 at 5.

In addition to the evidence adduced at trial that we have already identified, during his trial testimony, Singer admitted that he lied to law enforcement on May 2, 2017, when he stated that he did not have anything to declare besides the four or five items in plain sight, because he knew about the electronics, including the NanoStations, hidden under his bed. ECF No. 74 at 108-09. Singer also conceded that he lied to law enforcement on May 2, 2017, when he stated that the bed in the main cabin of the boat had been secured to the floor in Cuba. ECF No. 74 at 132.

In addition, the government admitted into evidence at trial several CG-3300 applications Singer had submitted during 2016 and 2017. *See* ECF No. 56-1 at 17, 22, 27, 34, 42, 46, 53, 104, 106, 115, 117. Each of them stated that the purpose of the anticipated voyage was "support [for] the Cuban People." *See id.*

16

Singer moved for judgment of acquittal on the attempted-smuggling count at the end of the government's case in chief. ECF No. 74 at 57. He argued that he did not take a "substantial step" towards committing the crime, since he canceled the May 2 trip to Cuba. *Id.* The district court denied the motion, *id.* at 57-58, and the jury later returned a verdict of guilty on both counts. ECF No. 105 at 32.

Singer then renewed his motion for judgment of acquittal. ECF No. 60. The district court again denied the motion. ECF No. 76. It later handed down a sentence based on a Sentencing Guidelines range that included a two-level enhancement for obstruction based on a finding that Singer had testified falsely during trial. ECF No. 97 at 26.

Singer timely appealed his attempted-smuggling conviction and his overall sentence. ECF No. 92.

**III.**

**A.    We find no error in Singer's conviction for attempted smuggling**

*1. Standard of Review*

We generally review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009). When the motion is based on sufficiency of the evidence, as it is here, we will affirm if a reasonable jury could find that the evidence demonstrates the defendant's guilt beyond a reasonable doubt. *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th

17

Cir. 2000) (per curiam).  In evaluating the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict for the government, and we make all reasonable inferences and credibility judgments in the government's favor as well.  *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014); *Seher*, 562 F.3d at 1364.[6]

### 2. *The evidence sufficiently supports Singer's conviction on the smuggling count*

Title 18, United States Code, Section 554(a), the statute under which Singer was charged, makes it a crime to "knowingly export[] . . . or attempt[] to export . . . any merchandise, article, or object contrary to any law or regulation of the United States."  Here, Singer was charged with knowingly attempting to export hundreds of NanoStations, contrary to 50 U.S.C. § 1705 and 15 C.F.R. § 746.2(a).

To prove attempt, the government must show two things:  that the defendant (1) had "the specific intent to engage in the criminal conduct with which he is charged; and (2) ha[d] taken a substantial step toward the commission of the offense that strongly corroborates his criminal intent."  *United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1394 (2019); *United States v. Yost*, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam).

---

[6] Though the government argues that we should review Singer's claim under the more stringent "plain error" standard, *see United States v. Batson*, 818 F.3d 651, 664 (11th Cir. 2016); *United States v. Straub*, 508 F.3d 1003, 1010-11 (11th Cir. 2007), we need not decide whether "plain error" review is appropriate because the standard we apply makes no difference ultimately to the outcome of Singer's appeal.  For that reason, we apply the stricter *de novo* standard.

Singer contends the district court erred in denying his motion for judgment of acquittal because, in his view, a reasonable jury could not find that the evidence was sufficient to show either prong of the offense—that he intended to violate U.S. law or that he took a substantial step towards committing the offense. We address each argument in turn.

### a.    Intent

Singer argues that the evidence at trial failed to show that he knew the NanoStations required a license for exportation to Cuba. In Singer's view, the government was required to prove he was aware of the specific characteristic of the NanoStations—their ability to encrypt communications—that resulted in their being classified as controlled under the export regulations. Since he claims the evidence did not demonstrate this, he asserts he is entitled to an acquittal on the smuggling count.

We begin, as always, with the statutory text. *See Staples v. United States*, 511 U.S. 600, 605 (1994). As we've noted, 18 U.S.C. § 554(a), the statute under which Singer was convicted, makes it unlawful to "knowingly export[] . . . or attempt[] to export . . . any merchandise, article, or object contrary to any law or regulation of the United States." Singer's indictment charged that Singer attempted to export items (the NanoStations) contrary to 50 U.S.C. § 1705 and 15 C.F.R. § 746.2(a). Section 1705 of the IEEPA, in turn, provides that anyone who "willfully" attempts

19

to violate any license, order, regulation, or prohibition issued under the IEEPA, "shall, upon conviction," be guilty of a felony.

Because the law Singer was convicted under § 554(a) of violating was § 1705, the statutory language at issue here actually includes two scienter requirements: § 554(a) employs the scienter standard "knowingly," while § 1705 uses the term "willfully." Beyond that, though, the language in a vacuum is not especially helpful to resolving whether the government must prove only that the defendant knew he was engaged, and the defendant willfully engaged, in the act of exporting or attempting to export, which happened to violate a law or regulation of the United States, or whether instead the government must also prove that the defendant knew that the particular export or attempted export at issue violated a law or regulation of the United States.

This case appears to raise an issue of first impression. But we are not without guidance. The Supreme Court has written much on the scienter requirement of various criminal statutes. We find these cases instructive here.

In construing a statute's scienter requirement where the statutory language is not necessarily explicit on the precise question at issue, we keep in mind that a statute's scienter requirement nonetheless raises a question of congressional intent. *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). When we ascertain congressional intent as it concerns scienter, "we start from a longstanding

20

presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* (citation and internal quotation marks omitted). To demonstrate how this presumption applies here, we review a few cases that have construed the scienter requirement of different statutes criminalizing the failure to comply with regulatory schemes.

In *Liparota v. United States*, 471 U.S. 419 (1985), the defendant was convicted of "knowingly us[ing] transfer[ring], acquir[ing], alter[ing], or possess[ing] [Food Stamps] in any manner not authorized by [the statute] or the regulations." *Id.* at 420. The Supreme Court considered whether, in addition to showing that the defendant knew that he had used, transferred, acquired, altered or possessed Food Stamps, the government also was required to prove that the defendant knew that he was acting in a way that the applicable statute or regulations did not authorize. *Id.* at 421.

The Court concluded it was. *Id.* at 425. As relevant here, the Supreme Court reasoned that if that were not the case, the statute there would "criminalize a broad range of apparently innocent conduct." *Id.* at 426. For example, the applicable statute required Food Stamps to be used to buy food at approved stores "at prices prevailing in such stores." *Id.* So if knowledge that the Food Stamps were being used in a way inconsistent with the governing statute and regulatory scheme were

21

not necessary, a Food Stamp recipient who used stamps to buy food from a store that, without the recipient's knowledge, charged higher prices to Food Stamp participants would be guilty of criminal conduct. *Id.* The Court determined that Congress could not have intended that broad interpretation. *Id.* at 427. So under *Liparota*, the government had to prove both that the defendant used Food Stamps and that he knew the facts that rendered his specific use unauthorized. *Id.* at 425; *see Elonis v. United States*, 135 S. Ct. 2001, 2010 (2015).

Similarly, *Ratzlaf v. United States*, 510 U.S. 135 (1994), involved a statute that criminalized "willfully violating" a law that made it illegal to break a single financial transaction that satisfied a financial institution's reporting threshold into smaller transactions so that the financial institution processing it would not have to report the transaction. *See id.* at 136-37. There, the Supreme Court concluded that the government must prove not only that the defendant knew of the financial institution's duty to report cash transactions over the threshold amount but also that he knew that he had a duty not to cause the bank to fail to comply with its reporting requirement by structuring his transaction into smaller transactions under the threshold. *Id.* at 146-47. In support of this conclusion, the Court explained that structuring financial transactions for some purposes can be legal, so structuring is not "so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement is

satisfied," regardless of whether the defendant knew that structuring in a given case was illegal. *Id.* at 146.

And in response to the dissent's concerns that proving the defendant's knowledge of the fact that he had a duty to refrain from structuring would be "impossible," the Supreme Court explained that "[a] jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct." *Id.* at 149 n.19. By way of example, the Supreme Court cited a Second Circuit decision where the circuit court held that evidence that the government had taken "affirmative steps" to make the defendant aware of a reporting duty through the use of visual notices and verbal announcements over the public address system "support[ed] [the] inference that [the] defendant 'willfully violated'" a statute. *Id.* (citing *United States v. Dichne*, 612 F.2d 632, 636–38 (2d Cir. 1979)).

Our predecessor Court faced a similar problem in *United States v. Warren*, 612 F.2d 887 (5th Cir. 1980) (*en banc*), before the Supreme Court decided *Liparota* and *Ratzlaf*. There, the statute at issue made it unlawful to knowingly and willfully transport more than $5,000 beyond a United States border without filing the required report. *Id.* at 890–91. Our predecessor Court concluded that to convict a defendant under this statute, the government must prove not only that the defendant knew she was transporting more than $5,000 into the United States but also that she knew she

23

was required to report that fact and nonetheless did not.  *Id.* at 890.  Similar to what the Supreme Court would later note in *Ratzlaf*, we then explained that to prove the second part of this equation, the government could show either that the defendant had been warned of the reporting requirement or that the defendant otherwise knew of the reporting requirement before being arrested for the crime.  *Id.*

From these cases, we glean two significant principles.

First, when it comes to statutes that criminalize violations that regulate what can otherwise be innocent conduct, it is not enough that the defendant engaged in actions that the law prohibits.  Rather, we must construe the statute to satisfy the "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct."  *Rehaif*, 139 S. Ct. at 2195 (citation and internal quotation marks omitted).

And second, to prove that the defendant had the necessary factual knowledge, the government need not *directly* demonstrate that the defendant knew the facts that made his conduct a violation of the law.  Rather, the government may circumstantially prove the defendant's knowledge through evidence that allows the jury to draw that reasonable inference.  Among other methods of establishing this element, the government may present evidence that it engaged in "affirmative efforts" to warn the defendant of the regulatory requirement he later violated or that

24

the defendant's conduct indicated that he knew of the fact that a regulation or statute prohibited his conduct at the time he engaged in it.

We apply these rules here when we consider whether the government presented sufficient evidence to establish intent. First, we hold that, as the government charged Singer, it was required to prove both that Singer violated 50 U.S.C. § 1705 and 15 C.F.R. § 746.2(a) and that Singer knew of the facts that made his conduct a violation of these provisions. We reach this conclusion because, as with the use of Food Stamps in *Liparota*, the structuring of financial transactions in *Ratzlaf*, and the transportation of money into the United States in *Warren*, the exportation of goods from the United States is not "so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement is satisfied," *Ratzlaf*, 510 U.S. at 146, even if Singer did not know of the facts that rendered his conduct illegal. And when it comes to crimes involving complex regulatory schemes, we generally do not criminally punish individuals engaged in conduct they reasonably believed to be innocent.

Second, we conclude that the evidence the government presented at trial satisfied this knowledge standard. In particular, the government put on evidence that it had repeatedly warned Singer of his "RESPONSIBILITY TO COMPLY WITH ALL OFAC & COMMERCE'S REGULATIONS." *See* ECF No. 56-1 at 15, 20, 25, 32, 44, 51, 100. And the several CG-3300 forms Singer signed and submitted to

25

obtain a permit to enter Cuban Territorial Seas each expressly warned Singer that (1) his application "must include a Department of Commerce *export license* for any vessel or conveyance entering Cuban seas": (2) "[f]ailure to obtain all of the appropriate permits and licenses prior to travel to Cuba may result in felony prosecution"; and (3) "[d]etailed information on the U.S. embargo [of Cuba] can be obtained from [OFAC] in Miami at 305 810-8140 & the Department of Commerce (DOC) at 954 366-7540 or 202 482-4811." *Id.* at 17, 22, 27, 34, 42, 46, 53, 104, 106, 115, 117 (emphasis added).  Plus, Singer himself sent letters in support of his CG-3300 applications that expressly stated what the "support for the Cuban People" general license covers and that noted, "For a complete description of what this general license authorizes and the restrictions that apply, see 31 CFR § 515.574." *Id.* at 19, 24, 38, 55.

Besides the evidence of warnings the government gave to Singer, Singer's conduct suggested he knew he was exporting items to Cuba that required a license that he did not have.  For example, on his CG-3300 applications, Singer described the purpose of his scheduled May 2, 2017, visit to Cuba as "SUPPORT OF THE CUBAN PEOPLE, FOR A MOTORCYCLE RALLY."  ECF No. 56-1 at 17.  True, the presence on May 1 of several motorcycles and other individuals on *La Mala* supports the notion that Singer did intend to attend a motorcycle rally in Cuba.  And Singer testified at trial that he believed the "support for the Cuban People" general

26

license allowed the exportation of certain items that Cubans could use in their homes to communicate, including cell phones, computers, and modems.

But the jury was free to disbelieve Singer, particularly in light of Singer's repeated recitations in his CG-3300 application paperwork of what the "support for the Cuban People" general license authorizes, a recitation that does not include the exportation of items on the Compliance Control List, such as the NanoStations. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true.'") (citation omitted).

That Singer lied to officers and said he had nothing to declare but the few items in plain view (which did not include the NanoStations) also supports the conclusion that Singer knew he was not allowed to export the NanoStations without a license. Otherwise, there would have been no reason for him to have lied about the NanoStations and hidden them in a compartment under a bed that was screwed to the floor. In addition, when the officers found the NanoStations in the hidden compartment, Singer admitted he lied about them and about the reason the bed was screwed to the floor because he did not want Blyth, Hatfield, and the other United States officers to find them.[7]

---

[7] Astute readers might recall that Singer testified he told the officers that he lied about the NanoStations because he did not want Cuban authorities—not United States authorities—to find

And when Korb interviewed Singer upon his return from Cuba on May 5, 2017, Singer said the NanoStations were for the men who were initially supposed to travel with him.  But agents seized 303 NanoStations, and only eight passengers were scheduled to travel with Singer to Cuba.  Plus, none of those eight were Cubans.  Rather, they were all from the United States or South Africa.  *See* ECF No. 56-1 at 17-18.  Singer's implausible response to Korb's inquiry further supports a finding that Singer knew the NanoStations could not be exported to Cuba without a license.  His lie indicates that he was trying to hide the fact that he knew he needed an export license for the NanoStations by trying to falsely suggest that he believed the NanoStations somehow fell into the "support for the Cuban People" general license or exception.

We conclude that this evidence certainly allowed the jury to draw the reasonable inference that Singer knew that he required a license to be able to export the NanoStations to Cuba.

Singer takes issue with this conclusion.  He argues that we cannot infer anything from the facts that the NanoStations were hidden in the compartment under the bed and that Singer lied about them, since other items that did not require a

---

them.  For their part, though, the officers testified that Singer said he lied about the NanoStations because he did not want United States authorities to know about them.  As we have explained, on appeal of a conviction, we view the evidence in the light most favorable to the government. *Grzybowicz*, 747 F.3d at 1304.

28

license were found in the same compartment with the NanoStations, and Singer lied about them as well. According to Singer, he had no reason to lie about the other items because they did not require a special license to export to Cuba.

But we can think of one. Singer may well have placed the other items in the hidden compartment because that was the most convenient place to stow them, because a full compartment made it less likely that the NanoStations would move around en route, or because he lacked space elsewhere. Whatever the reason, one thing is clear: had Singer declared the other items that were in the hidden compartment under the bed, Singer knew that the officers, who were conducting an outbound inspection, would have required Singer to show the items to them. Then Singer would have had to unscrew the bed and reveal the hidden compartment. When he did so, the officers necessarily also would have found the NanoStations. So we are not persuaded that the jury was required to view Singer's lies to the officers and his hiding of the NanoStations as conduct consistent with a lack of knowledge that he was required to obtain a license before exporting the NanoStations to Cuba.

### b. Substantial Step

Next, we consider whether sufficient evidence established that Singer took a "substantial step" towards the commission of the offense.

A substantial step is an "objective act[] that mark[s the defendant's] conduct

29

as criminal such that his acts as a whole strongly corroborate the required culpability." *United States v. Stahlman*, 934 F.3d 1199, 1225 (11th Cir.) (citation and internal quotation marks omitted), *cert. denied.*, 140 S. Ct. 530 (2019). Mere planning or preparation to engage in a crime is not enough to constitute a "substantial step." *St. Hubert*, 909 F.3d at 351 (citation omitted). Rather, to take a substantial step, the defendant must engage in "objectively culpable and unequivocal acts toward accomplishing the crime." *Id.* (citation omitted). Here, the jury instructions defined "substantial step" as "an important action leading up to the committing of an offense—not just an inconsequential act. It must be more than simply preparing. It must be an act that would normally result in committing the offense." ECF No. 47 at 14.

Singer argues that he did not undertake a "substantial step" towards committing attempted exportation because he canceled his trip to Cuba on May 2, 2017. According to Singer, he did nothing more than make mere preparations to travel, and he canceled his trip after the officers visited him on May 1.

Singer claims Blyth's testimony corroborates his claim. He also notes that the eight other individuals who were scheduled to travel with him to Cuba left with their belongings on May 1. In addition, Singer points to the fact that his boat was moored in the same location on May 2 as it was on May 1. And on May 2 when the officers arrived at the marina, *La Mala*'s engines were not running and, according to Singer,

30

no other preparations for departure had been made.  Because Singer did not begin his voyage on May 2, and because it is not a crime to merely possess the NanoStations, Singer asserts that no evidence supports a finding that he took a substantial step towards the commission of the charged offense.  We disagree.

First, we disagree with Singer's characterization of Blyth's testimony—that Blyth agreed that Singer altogether canceled the May 2 trip to Cuba.[8]  True, Blyth

---

[8]  The relevant exchange between defense counsel and Blyth was as follows:

> Q:  How many people were there [on May l , 2017]?
> A:  Approximately eight.
> Q:  And how many motorcycles were there as well?
> A:  It's hard to say. I know I observed a number of motorcycles on the boat.
>
> ***
> Q:  You didn't inspect the boat that day, correct?
> A:  Correct.
> Q:  So you don't know what was on the boat that day, correct?
> A:  Correct.
> Q:  And you told Mr. Singer, I will be back, correct?
> A:  I told Mr. Singer he couldn't leave because his permit wasn't for May 1.  I told him he could leave on May 2, and that, yes, we would be back to inspect his vessel.
> ***
> Q:  And when you came back the second day [May 2, 2017], all those seven or eight individuals, they weren't there anymore, right?
> A:  Correct.
> Q:  Those Harleys or motorcycles are gone, correct?
> A:  Correct.
> Q:  Trip was canceled, correct?
> A:  Yes.
> Q:  He told you—Mr. Singer told you he canceled the trip, correct?
> Prosecutor: Objection
> Court: Sustained.
> A:  Mr. Singer didn't cancel the trip.
> Prosecutor: The objection is sustained.
> Witness: I am sorry.

did agree that, as of May 2 (when he returned to Singer's boat), the "trip was canceled." But it appears this statement meant something other than what Singer suggests.

The words themselves did not necessarily mean that Singer had decided not to travel to Cuba. Blyth could have meant that the original plan to take the eight other individuals to Cuba had been canceled, but Singer still planned to make the trip to deliver the electronics. Indeed, when pressed with the specific question of whether Singer told him he canceled the trip, Blyth said, "Singer didn't cancel the trip." And while during his own testimony, Singer indicated that he canceled the trip, the jury was free to discredit this testimony. *See Brown*, 53 F.3d at 314; *United States v. Jiminez*, 564 F.3d 1280, 1285 (11th Cir. 2009).

Second, the evidence supports the reasonable conclusion that Singer did not cancel his trip altogether (the same evidence indicates that Blyth understood this to be the case). Singer filed for and obtained a valid CG-3300 permit that would have allowed him to sail to Cuba on May 2 (the date the items were seized). And when law enforcement returned to the dock on May 2 to conduct an outbound inspection of the boat, Singer reportedly told Blyth that he had a "valid [Form] 3300 that would allow him to sail to Cuba, and that he wished to sail to Cuba." ECF No. 58 at 12-

---

ECF No. 58 at 47-48.

32

13.  Plus, had Singer canceled his voyage on May 1, he would have had no reason to make a declaration of what was onboard when asked during the outbound inspection.  Indeed, there would have been no reason for Blyth to have conducted an outbound inspection of Singer's boat if Singer had canceled his trip to Cuba.  After all, an outbound inspection is conducted so that a vessel may depart the United States.

Finally, Singer actually *did* travel to Cuba by boat on May 3—the day after law enforcement seized the NanoStations.  Singer took the remaining cargo during this trip.  While Singer testified that he canceled the original trip and took the trip a day later only after others at the marina convinced him to make the voyage, the jury was free to disbelieve him, particularly in light of the circumstantial evidence that contradicted Singer's assertion.  And even though Singer testified he decided on May 1 to cancel the trip, he did not remove all the cargo from his ship, including the four or five items in plain view and the NanoStations (and other items) from under his bed.

For these reasons, when we view the evidence in the light most favorable to the government, we conclude that a reasonable jury had sufficient evidence to find that Singer took a substantial step towards exporting the NanoStations to Cuba.

**B.**    **The district court did not err in declining to give Singer's proposed jury instruction**

Singer next contends the district court erred when it failed to give his proposed jury instruction on ignorance of the law.  This argument relates to the intent issue we discussed above in Section III.A.2.a.  Singer asserts that, because the government was required to show he knew the NanoStations could not be exported to Cuba without a license, the district court should have instructed the jury that Singer's ignorance of the relevant regulation was a defense.

Singer proposed the following jury instruction:

> The defendant has asserted that he was not aware of the export control laws that prohibited the attempted export of the Ubiquiti Nanostations M2 Network Modems.  As a general rule, ignorance of the law is no excuse.  However, in this case ignorance of the law is a defense to crimes charged against the defendant.

ECF No. 38 at 2.  The district court declined to give the requested instruction and instead instructed the jury as follows:

> Title 18, United States Code, Section 554, makes it a crime for anyone to knowingly or fraudulently attempt to export or send any merchandise from the United States contrary to any law or regulation of the United States.
>
> For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
>
> First:     That the Defendant knowingly or fraudulently attempted to export or send merchandise, as described in the second superseding indictment, or that the Defendant concealed or facilitated the concealment of such merchandise, prior to exportation, knowing the same to be intended for exportation;

Second:    That the Defendant's attempted exportation or sending was contrary to Title 50, United States Code, Section 1705 of Section 746.2(a) of the Export Administration Regulations; and

**Third:    That the Defendant knew that exportation or sending of the merchandise was contrary to law or regulation.**

"Merchandise" means goods, wares, and chattels of every description, and includes merchandise the exportation of which is prohibited.

To "export" means to send or carry from the United States to another country.

"Fraudulently" means with the specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self.

ECF No. 47 at 11-12 (emphasis added).

We have recognized that a criminal defendant has a right to a jury instruction on his proposed theory of defense, provided that theory of defense is a valid one and some evidence at trial supports the instruction. *See United States v. Arias*, 431 F.3d 1327, 1340 (11th Cir. 2005). We review a district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Jeri*, 869 F.3d 1247, 1268 (11th Cir. 2017); *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (per curiam); *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). We will reverse a district court's refusal to give a requested jury instruction only if the

proposed instruction correctly reflects the law, the jury instructions the district court actually gave did not address the proposed instruction, and the district court's refusal to give the requested instruction "seriously impaired the defendant's ability to present an effective defense." *United States v. Horner*, 853 F.3d 1201, 1208 (11th Cir. 2017) (quoting *United States v. Drury*, 396 F.3d 1303, 1318 (11th Cir. 2005) (internal quotation marks omitted)).  So long as the district court's jury instructions "accurately reflect[] the law, the trial judge has wide discretion to decide on the style and wording of the instruction."  *Id*.  We "examine[] the jury charge[] as a whole, determining whether the entire charge sufficiently instructed the jury about the issues."  *Id.*

Here, we conclude the district court did not abuse its discretion when it declined to give Singer's proposed instruction.  The court was not required to adopt the precise wording of Singer's proposed charge, since it nonetheless covered the substance of Singer's proposed instruction in the charge it gave.  Specifically, the district court's instruction informed the jury that to convict Singer on the attempt count, the jury was required to find that Singer knew he was attempting to export NanoStations to Cuba, that he knew he was doing so without a license, and that he knew those actions violated federal law or regulations.

That is all that was necessary to instruct the jury on the scienter requirement here.  Under this instruction, a reasonable jury could not have convicted Singer had

the government failed to present sufficient evidence establishing that Singer knew of the fact that the law and regulations prohibited the exportation of the NanoStations to Cuba without a valid license authorizing that conduct.

Plus, Singer's proposed instruction risked confusing the jury. As we have explained, the government was required to show that Singer knew of the fact that the law and regulations prohibited the exportation to Cuba of the NanoStations without a valid license. Singer's proposed instruction unnecessarily introduced the concept of "ignorance of the law." Even the Supreme Court has not always consistently differentiated between the concepts of knowledge of the facts and knowledge of the law when it comes to the scienter necessary to establish a criminal violation of a regulatory scheme. *Compare Elonis*, 135 S. Ct. at 2010 (describing *Liparota* as having construed the statute at issue there as "requir[ing] knowledge of the facts that made the use of the food stamps unauthorized") *with Bryan v. United States*, 524 U.S. 184, 193 n.15 (1998) (describing *Liparota* as having "concluded that both the term 'knowing' . . . and the term 'knowingly' . . . literally referred to knowledge of the law as well as knowledge of the relevant facts"). We see no reason to complicate the jury's task by unnecessarily employing complicated concepts in the instructions.

The refusal to give Singer's proposed instruction also did not impair Singer's ability to present his defense, let alone substantially impair it. Singer was just as

37

able to argue to the jury that the government failed to prove he knew of the fact that federal law prohibited him from exporting the NanoStations to Cuba. *See Jeri*, 869 F.3d at 1268. As we have noted, Singer even testified in an attempt to convince the jury that he was not aware of the fact that federal law prohibited him from exporting the NanoStations to Cuba. Singer also presented expert testimony to establish that the regulations at issue were complex and hard to understand. And he tried to convince the jury that he believed the "support for the Cuban People" general license exempted him from the need to obtain a license to export the NanoStations.

In short, the district court's jury instructions adequately covered Singer's proposed instruction, and the district court did not abuse its discretion when it declined to give Singer's proposed jury instruction on ignorance of the law.

## C. **The district court did not err in applying the sentencing enhancement for obstruction of justice**

Finally, Singer challenges the district court's application of a two-level sentence enhancement for obstruction of justice. The district court determined that the enhancement applied because it found that Singer committed perjury during trial. In particular, the district court concluded Singer perjured himself when he testified that he hid the items in the compartment under his bed from Cuban authorities, not from United States authorities.[9] When it comes to the imposition of an enhancement

---

[9] Singer testified as follows:

for obstruction of justice, we review the district court's factual findings for clear error and its application of those facts to the Sentencing Guidelines *de novo*. *United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018).

---

Q: Okay. But then after they found [the compartment under your bed with the 303 NanoStations], you told law enforcement that you didn't want them to find it?
A: I did not, sir.
Q: So Agent Hatfield – or Officer Hatfield was lying when he said that?
A: I did not say that I was hiding it from the authorities. And I believe, if I recollect, I listened very carefully to Mr. Hatfield, he says I was hiding it from law enforcement. He didn't say whose [sic].
Q: So that's your testimony, that he was – Hatfield was ambiguous as to what you were saying?
A: I was hiding it from Cuban law enforcement, sir.
Q: Did you say that to him?
A: Yes, I did.
Q: You didn't say you were hiding it from U.S. law enforcement?
A: No, sir.
Q: Just hiding it from some law enforcement?
A: Cuban law enforcement.
Q: You didn't say you were hiding it from Agent Blyth?
A: No, sir.
Q: Not from Officer Hatfield?
A: I didn't want to help him, sir.

*** 

Q:  You are saying that the testimony of Agent Blyth and Agent Hatfield about your lie is incorrect?
A: You have to be more specific.
Q: When they said you lied about hiding it from them, they were lying, is that your testimony?
A: I would have to assume that they said I was hiding it from them. I was hiding it from the Cuban authorities.

ECF No. 74 at 113-114.  Singer's testimony reflects that he steadfastly contended to Blyth and Hatfield that he lied about hiding the NanoStations under the bed because he was hiding them from *Cuban authorities*.

39

Here, we find no error.  Section 3C1.1 of the Sentencing Guidelines governs the application of an enhancement for obstruction.  It provides that the defendant's offense level will be increased by two levels if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

*See* U.S.S.G. § 3C1.1.  A court may apply the obstruction enhancement where the defendant testifies on his own behalf and perjures himself while doing so.  *See* U.S.S.G. § 3C1.1 cmt. n.2 (explaining that the enhancement is not intended to punish a defendant who exercises his constitutional right to testify, "other than a denial of guilt under oath that constitutes perjury"); *see also United States v. Dunnigan*, 507 U.S. 87, 96-97 (1993), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997).  Indeed, the commentary to § 3C1.1 provides examples of conduct considered to be "obstructive" under Section 3C1.1, including committing perjury, U.S.S.G. § 3C1.1 cmt. n.4(B), and "providing materially false information to a judge or magistrate judge," U.S.S.G. § 3C1.1, cmt. n. 4(F).

Perjury is the "false testimony concerning a material matter with the willful intent to provide false testimony."  *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (citation and internal quotation marks omitted).  Note 6 to Section

40

§ 3C1.1 defines materially false information as "information that, if believed, would tend to influence or affect the issue under determination." *See* U.S.S.G. § 3C1. 1 cmt. n.6. Usually, material testimony goes to the issue of a defendant's guilt. *See United States v. McKinley*, 732 F.3d 1291, 1298 (11th Cir. 2013).

It makes sense then, that the application of the enhancement requires that a district court "make an independent factual finding that the defendant gave perjured testimony on a material matter." *United States v. Vallejo*, 297 F.3d 1154, 1168 (11th Cir. 2002); *see also Dunningan*, 507 U.S. at 95. Although a district court should preferably "make specific findings by identifying the materially false statements individually, it is sufficient if the court makes a general finding of obstruction encompassing all the factual predicates of perjury." *Duperval*, 777 F.3d at 1337 (citation and internal quotation marks omitted); *see also Guevara*, 894 F.3d at 1311 (noting that sentencing courts should make specific findings of fact when they adjust sentences for obstruction of justice, but recognizing if the record supports the adjustment by clearly reflecting the basis for it, the court need not make individualized findings regarding obstruction of justice).

Singer challenges the district court's application of the enhancement on two grounds. First, he contends the district court failed to make specific, independent findings of perjury and instead merely found the jury's verdict to be a "definitive referendum" on the falsity of Singer's testimony as to why he concealed the

41

NanoStations on his boat.  Second, Singer asserts, even assuming the statements he made during trial were false, they were not material because he admitted that he lied to agents and apologized for that conduct.  We address each ground, in turn.

### 1. *The district court made the necessary findings to support its conclusion that Singer's testimony was false*

The district court made the required findings regarding perjury.  It identified specific testimony it found to be false—Singer's statements that he did not intend to conceal cargo from U.S. law enforcement and that he canceled his trip to Cuba—and concluded Singer knew them to be false when he uttered them on the stand.  ECF No. 97 at 5-6.  In doing so, the district court did not merely adopt the jury's verdict to determine that Singer's testimony was false.  Rather, the district court independently evaluated the issue and provided a sufficient explanation for its conclusion.  Indeed, the district court expressed its own view that Singer "testified falsely" and stated that it was "satisfied that [Singer's] testimony was 'knowingly false.'"  ECF No. 97 at 5-6.  When the government requested the enhancement for obstruction of justice, the district court stated, "I believe that is appropriate.  [Singer] went to trial and he testified.  He testified falsely."  ECF No. 97 at 5.

In deciding to apply the enhancement, the district court judge emphasized,

> I was the judge at the trial and I recall this testimony and I thought it was material to the case and to his defense.  He took the stand and he tried to marginalize his criminal conduct by suggesting that he wasn't trying to conceal it

42

from U.S. Government officials but from Cuban officials, as if for that reason it was therefore okay.

That went right to his credibility and, obviously, the jury chose not to believe him, and that was one of the core defenses that he had. So I can't conclude that it was not material.

*Id*. at 8-9. This explanation is sufficient because it expressed the district court's independent view that Singer committed perjury. The district judge relied on his recollection of the evidence and the credibility of the witnesses. We do not second-guess the district court's credibility determination. *See United States v. Williams*, 340 F.3d 1231, 1240 (11th Cir. 2003) ("An appellate court is not in a position to assess a defendant's demeanor, apparent sincerity, intonation, expression, gesticulations, and a wide range of other considerations that are pertinent in determining whether he has perjured himself.").

The evidence also supports the district court's conclusion that Singer testified falsely with respect to both statements. First, and as we have already discussed, the evidence supports a finding that Singer testified falsely when he said that on May 1, 2017, he canceled his trip to Cuba.

Second, the evidence supports a finding that Singer testified falsely when he said he hid the NanoStations under his bed from Cuban authorities, not United States authorities. Singer failed to declare the items under the bed when United States law enforcement boarded his boat and conducted an inspection on May 2. If Singer were

43

merely hiding the items from Cuban law enforcement, there would have been no reason not to advise United States authorities about the cargo—particularly if Singer did not realize that he could not export the NanoStations to Cuba without a license. Singer's failure to tell United States law enforcement about the items raised a reasonable inference that he was trying to hide the items from United States officials and that he was lying during his testimony. Finally, Blyth and Hatfield both testified that Singer admitted on May 2 that he was hiding the NanoStations from United States law enforcement. Their testimony directly contradicted Singer's. And the district court was free to accept their testimony over Singer's.

### 2. *The district court did not err in concluding that Singer's false statements were material*

The district court also concluded that the false testimony at issue "was material to the case and to [Singer's] defense." ECF No. 97 at 8. In particular, the district court found the misstatement about hiding the cargo from Cuban authorities (as opposed to United States authorities) to be material because it was "one of the core defenses that [Singer] had." ECF No. 97 at 9. We agree.

As we have discussed, to convict Singer of violating § 554(a), the government had to prove that Singer knew that the attempted exportation to Cuba was "contrary to [a] law or regulation of the United States." *See* 18 U.S.C. § 554(a). So Singer's decision to hide the cargo from United States authorities (as opposed to Cuban authorities) provided strong circumstantial evidence that Singer knew the attempted

44

exportation violated United States law.  The district court could have fairly concluded that when Singer falsely testified that he hid the cargo from Cuban authorities, he attempted to mislead the jury into believing that he was unaware of the criminal nature of his conduct.  If Singer had testified truthfully—that he hid the cargo from United States authorities—it would have supported the inference that he knew the attempted transportation of the goods violated the law.  For these reasons, the misstatement was material to the case.

Singer attempts to persuade us that his apology to law enforcement for lying negates the materiality element.  We disagree.  Although Singer did apologize for failing to declare the cargo under his bed after United States officers found it, he claimed that he lied about concealing it because he was angry with Blyth.  But significantly, Singer never conceded that he lied to United States law enforcement when he claimed he hid the NanoStations from Cuban authorities.  That he hid the cargo at all and from whom specifically he sought to hide it concern two different issues.  So Singer's apology concerning one has no bearing on the other.

Because the record amply supports the district court's conclusion that Singer perjured himself when he testified that he told United States law enforcement that he had hidden the NanoStations from Cuban officials, not from United States ones, we need not consider the other misstatement by Singer—that he canceled his trip to

Cuba.  Ultimately, the district court did not clearly err when it imposed the two-level enhancement for obstruction.

## IV.

For the foregoing reasons, we conclude that sufficient evidence supported the verdict here, the district court did not err in declining Singer's proposed ignorance-of-the-law jury instruction, and it similarly did not err in sentencing Singer.  We therefore affirm Singer's conviction and sentence.

**AFFIRMED.**