[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10821
Non-Argument Calendar

_____

D.C. Docket No. 0:19-cr-60086-RLR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIELLE EDMONSON EL,
KENNETH ROGER EDMONSON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 8, 2021)

Before MARTIN, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Danielle Edmonson and Kenneth Edmonson[1] appeal their convictions and sentences for making false, fictitious, or fraudulent claims, mail fraud, and making false statements. The Edmonsons argue that they're entitled to a new trial because of an evidentiary error, prosecutorial misconduct, and errors in the jury instructions. Kenneth also argues that the district court should have sua sponte inquired into his competency and whether he wanted substitute counsel. We affirm.

## FACTUAL BACKGROUND

Between 2012 and 2014, Danielle filed unremarkable tax returns. Her return in 2014, for example, provided that she made $3,672 and sought a $578 refund. But in August 2015, Danielle filed a return seeking a $239,700 refund. This return included handwritten forms, purportedly from companies like Citibank, claiming that she had paid over $300,000 in taxes. In September 2015, the government sent Danielle a refund check for $239,700. She deposited this money into her bank account. Danielle then withdrew $20,000 from her account as a cashier's check made out to Kenneth (her father).

---

[1] We refer to Danielle and Kenneth as the Edmonsons when talking about both of them. We use their first names when referring to only one of them.

2

In September 2016 and again in March 2017, Danielle filed returns for tax year 2015 seeking a refund of over $80,000,000.  The returns claimed that in 2015 she had earned over $153,000,000 and paid over $140,000,000 in taxes.  The government did not issue Danielle a refund in response to these returns.

In May 2017, the Edmonsons submitted passport applications, both listing "000-000-0000" as their social security number and declaring that they were "never issued a social security number."  But the Edmonsons had received social security numbers at birth and used them in their tax returns.

In September 2017, Danielle filed a return seeking a $2,405,073 refund.  This return claimed that in 2016 she had earned millions of dollars in interest from a trust.  In October 2017, the government sent her a $2,405,193 refund check.  Danielle deposited the money into her bank account, but her bank froze the account due to the size of the check.

Also in September 2017, Kenneth filed a return similar to the one Danielle had filed that month.  This return claimed that Kenneth had made over a million dollars in interest from a trust and sought a $725,111 refund.  In January 2018, the government sent him a $734,266 refund check.  Kenneth deposited the money into his bank account on January 8, 2018, withdrew $5,000 the next day, and transferred $1,000 to Danielle.

3

In January 2018, Danielle filed a tax return seeking a $9,572,279 refund. Later that month, IRS agents executed a search warrant at the Edmonsons' home. The agents seized copies of tax returns the Edmonsons had filed and correspondence sent to them by the IRS. The agents also found a box full of blank 1099 forms and handwritten wish lists including items like a "refund check in the amount of $80,112,167" and a new "fully load[ed]" Cadillac.

Special Agent Karyn Calabrese told the Edmonsons that the returns they had filed were fraudulent. Special Agent Calabrese warned the Edmonsons to not withdraw any more money from their bank accounts. Later that day, Kenneth tried unsuccessfully to withdraw more money from his account. Two months later, Kenneth filed an amended return seeking a $825,628 refund. The IRS never received valid 1099 forms from Citibank or any other entity mentioned in the Edmonsons' returns corroborating the amount of tax withheld in the returns they filed between 2015 and 2018.

## PROCEDURAL HISTORY

The Edmonsons were indicted for making false, fictitious, or fraudulent claims, in violation of 18 U.S.C. sections 287 and 2; mail fraud, in violation of 18 U.S.C. sections 1341 and 2; and making false statements, in violation of 18 U.S.C. section 1001. They raised a good faith defense at trial. As Danielle's counsel put it during opening statements, they identified as "Moorish Americans" and truly

believed they were entitled to the refunds they sought because the government owed them an "ancestral inheritance."

After a four-day trial, the jury found the Edmonsons guilty of all counts. The district court sentenced Danielle to 72 months in prison followed by three years of supervised release and sentenced Kenneth to 51 months in prison followed by three years of supervised release. Here are the parts of the trial and pretrial proceedings relevant to the issues on appeal.

*Kenneth's Courtroom Behavior*

At his initial appearance, Kenneth stated that he didn't "consent to anything here." He described the charges as "just accusations" and denied them. Kenneth maintained that he didn't suffer from any mental health issues and understood the charges and penalties. He said that he wanted to represent himself and the magistrate judge conducted a Faretta[2] inquiry. When asked if he had any mental health problems, Kenneth replied, "No. That's insulting." Kenneth told the magistrate judge that he was a "Moor" and the district court therefore had no jurisdiction over him. The magistrate judge found that Kenneth knowingly and voluntarily waived his right to counsel and allowed him to represent himself.

At a status hearing in June 2019, the district court asked Kenneth whether he wanted to join in certain motions Danielle had filed. Kenneth replied:

---

[2] See Faretta v. California, 422 U.S. 806 (1975).

> On the record and for the record, I am Kenneth in propria persona at this time and at all times. My nationality is Moor, my status is white, I am not lost at sea, nor am I dead at sea. I am bound to this land through blood line and nationality, I am a descendant of the great pharaohs of Kemet and Canaanites. I am an Aboriginal Indigenous Moorish American National and I am exercising all of my rights at this time and all points in time. You are commanded to state your name, your nationality, and your status on the record for the record immediately, without further comment. I am the law and I am the Government. Now, you do not have jurisdiction over me, I command you to set me free immediately, return my property immediately, leave my property immediately, cease and desist all actions and contact, take your leave and never return. This is your due process of notice of intent to lien.

Kenneth repeatedly invoked this pre-scripted statement during the proceedings in response to the district court's questions.

At a status hearing in August 2019, the district court observed that the Edmonsons had answered its questions with "pre-scripted frivolous legal argument" and had made "frivolous legal arguments" in their pro se legal filings. The district court told the Edmonsons that "there must not be any outbursts" at trial and prohibited them from answering future questions with "pre-scripted legal argument." The district court questioned Kenneth to see if he would abide by this order and he responded with his pre-scripted statement. The district court found that Kenneth was "engaging in obstructionist misconduct through the repeated advancement of [his] sovereign citizen beliefs." The district court then found that Kenneth would "engage in the same obstructionist conduct" at trial and terminated his self-representation.

At a status hearing shortly before trial, Kenneth's appointed counsel told the district court that Kenneth wasn't communicating with him. Kenneth maintained that his counsel didn't represent him. Kenneth's counsel stated that he didn't believe a continuance would change anything and he would try his best to communicate with and defend Kenneth.

The district court then expressed concern that the Edmonsons might disrupt the trial and sought their assurances that they would not. Kenneth responded:

> I will do that if you state your name, nationality, and status on the record, for the record immediately. You need to prove to me that you are a judge. See, I know you are not no judge, I know you are an administrator, you are a public service. I am the master, I don't take no orders from you. You are committing fraud here.

Kenneth continued: "In 2010, your boss, Barack Hussein Obama signed into effect rights for indigenous people to declare our nationality. That is what we did. That was your boss. Let's speak about his boss. On July 4 . . . Pope Francis demanded . . . ." The district court cut him off and stated it would revisit the issue at the start of trial and would place Kenneth in a holding cell to watch the trial remotely if he refused to behave.

The district court then conducted a <u>Faretta</u> inquiry and Kenneth responded with his pre-scripted statement. Kenneth added that he was "going to sue everybody in here" because the proceeding was a fraud and the district court was "not an

7

Article III judge." The district court again found that Kenneth would disrupt the trial if he represented himself.

On the first day of trial, the district court asked Kenneth whether he promised to behave. He responded with his pre-scripted statement. The district court ordered Kenneth to answer the question and he stated that he would "remain silent." The district court held him in contempt and required him to watch a video feed of the trial remotely. The district court asked Kenneth each day of trial if he would behave, and each time he refused to say that he would.

At sentencing, the district court informed Kenneth of his right to make a statement. Kenneth responded that he "would like to exercise that right." He then recited his pre-scripted statement.

*The IRS Letters*

The government moved to introduce the letters sent by the IRS to the Edmonsons that were found during the search of their home, warning them "of the frivolous nature of their returns" and the "potential criminal penalties." One letter called the notion that "African and Native Americans can claim a special tax credit as reparations for slavery and other oppressive treatment" a frivolous credit myth. The government argued that the letters were non-hearsay and offered for their effect on the Edmonsons. The warnings in the letters, the government argued, showed that

8

the Edmonsons knowingly and intentionally filed false returns and didn't have a good-faith belief about their legitimacy.

The Edmonsons objected that these letters were hearsay and violated the Confrontation Clause. The district court concluded that the letters were non-hearsay and admissible. At trial, the district court gave—at the Edmonsons' request—a limiting instruction about the letters, cautioning the jury that they were not offered for the truth but to show their effect on the Edmonsons.

*Closing Argument*

To support the Edmonsons' good faith defense, Danielle called Special Agent Harlan Daar, a tax fraud investigator. Special Agent Daar had met with Danielle at her request, posing as a customer service representative. Danielle explained at length to Special Agent Daar why she believed her tax returns were legitimate. Special Agent Daar testified that Danielle's arguments didn't make "any sense whatsoever."

During closing argument, the prosecutor addressed the defense case:

I think their witness, which was the only witness that was called, said it best when he said it makes no sense. And the reason it makes no sense is because it's a scam. If this were real, if there was some real claim, you could just send a letter to the IRS and say, hey, look . . . this is my ancestry, I believe I am owed this money, can you please send me a check for this amount. But did you see that in this case? Did you see anything setting that out?

9

Danielle's counsel objected that this argument was burden shifting. The district court sustained the objection and told the jury to disregard the government's last statement.

In rebuttal, the prosecutor again addressed the defense theory:

> Well, I think [the Edmonsons] would have to believe that filing a 1040-NR they would have to have a good faith belief that that's what they had to do. Does that make any sense to you? They would have to have a good faith belief that they had to fabricate 1099s, income forms, in order to get this money. Does that make any sense to you? If they think that the United States owes them a debt, they are filing instruments that say Citibank owes them money . . . . Does that make sense to you? If the United States owed someone a debt, would the only way to get it be to file false documents? Does that make any sense to you?

Danielle's counsel objected that this argument was a comment on silence. The district court struck the comment to the extent it suggested that the Edmonsons had a duty to testify.

*The Jury Instructions*

The Edmonsons had four objections to the jury instructions. First, they argued that the instructions should include language clarifying that the jury was required to consider whether the Edmonsons were guilty of each count "as alleged in the indictment." The Edmonsons argued that without this language the jury might convict on a theory that wasn't returned by the grand jury, which would be a variance or a constructive amendment of the indictment. The district court overruled the

objection and gave the circuit's pattern instructions for the three substantive offenses.

Second, the Edmonsons objected to language in the instruction for making false, fictitious, or fraudulent claims stating that "[t]he defendant does not have to directly submit the claim to an employee or agency of the United States. It is sufficient if the defendant submits the claim to a third party knowing that the third party will submit the claim or seek reimbursement from the United States or a department and agency thereof." The Edmonsons argued there was no evidence of third-party submissions. The government argued there was evidence that some of the returns were filed through a third-party tax company. The district court overruled the objection and included the language in the instruction.

Third, after the district court granted the Edmonsons' motion to instruct the jury on the good faith defense, the government requested that the instruction—modeled after the circuit's pattern special instruction 17 at the Edmonsons' request—include the following language: "But an act is not done in good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent." The Edmonsons objected that this language was already covered by the instruction and, in any event, only applied to business ventures. The district court overruled the objection and included the language in the instruction.

11

And fourth, the Edmonsons objected to the district court instructing the jury on aiding and abetting liability. They argued that there was no evidence to support the instruction, and also argued that a defendant cannot aid a completed crime. The government argued that the Edmonsons filed false returns that were very similar to each other, had a joint bank account, and shared money with each other after receiving large refunds. The district court concluded there was enough evidence of aiding and abetting, overruled the Edmonsons' objection, and gave the instruction.

## STANDARDS OF REVIEW

Several standards of review apply here. We review evidentiary rulings for an abuse of discretion. United States v. House, 684 F.3d 1173, 1197 (11th Cir. 2012). We review de novo claims of prosecutorial misconduct. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). We also review de novo the legal correctness of a jury instruction, United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000), but questions of phrasing are reviewed for an abuse of discretion, United States v. Lopez, 590 F.3d 1238, 1247 (11th Cir. 2009). "District courts enjoy broad discretion in formulating jury instructions, so long as the charge as a whole accurately reflects the law in the context of a case's facts." United States v. Isnadin, 742 F.3d 1278, 1296 (11th Cir. 2014). We review the district court's failure to sua sponte order a hearing on the defendant's competency for an abuse of discretion. United States v. Wingo, 789 F.3d 1226, 1236 (11th Cir. 2015). And we review the district court's

12

ruling on a motion to appoint new counsel for an abuse of discretion. United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

## DISCUSSION

The Edmonsons argue that: (1) the district court erred by admitting the IRS letters; (2) the prosecutor twice commented on their decision not to testify; and (3) the district court erred by overruling their four objections to the jury instructions. Kenneth argues that the district court erred by not sua sponte ordering a competency hearing and not conducting a hearing on whether to grant him substitute counsel.

### The IRS Letters

The Edmonsons argue that the district court erred by allowing the IRS letters into evidence because they were hearsay and violated the Confrontation Clause. We disagree.

Hearsay is an out-of-court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c). "Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay." United States v. Rivera, 780 F.3d 1084, 1092 (11th Cir. 2015); Fed. R. Evid. 801(c) Advisory Committee's Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

Whether the Edmonsons acted with a fraudulent intent was the central issue at trial. The section 287 charges required proof that the Edmonsons submitted claims

13

that they knew were "false, fictitious, or fraudulent." See 18 U.S.C. § 287. The mail fraud charges required proof that the Edmonsons intentionally participated in a "scheme or artifice to defraud another" using the mail. See 18 U.S.C. § 1341. The Edmonsons put their intent at issue by pleading not guilty. See United States v. Zapata, 139 F.3d 1355, 1358 (11th Cir. 1998) ("A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent . . . ."). They also put their intent at issue by raising a good faith defense. In Danielle's counsel's words, the "central question" for the jury was whether the Edmonsons truly believed they were entitled to these hefty tax refunds.

The government used the IRS letters to meet its burden of proof as to intent and to rebut the Edmonsons' good faith defense. These letters warned the Edmonsons that their tax returns were "frivolous" and could result in criminal liability. One letter debunked as a frivolous credit myth the notion that "African and Native Americans can claim a special tax credit as reparations for slavery and other oppressive treatment." Because these letters were not offered for the truth of the matter asserted but for the effect on the listener—to show that the IRS put the Edmonsons on notice that their claims were frivolous—the district court correctly concluded that they were not hearsay. See Rivera, 780 F.3d at 1092.

14

And because the letters weren't hearsay, their admission didn't violate the Confrontation Clause. The "Confrontation Clause prohibits only statements that constitute impermissible hearsay" and "are testimonial." United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009). A statement is testimonial if it's the "functional equivalent" of in-court testimony or "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford v. Washington, 541 U.S. 36, 51–52 (2004). A statement admitted "for a purpose other than for the truth of the matter asserted . . . does not violate the Confrontation Clause." Jiminez, 564 F.3d at 1287.

As we explained above, the IRS letters were non-hearsay. They were also non-testimonial because they were meant to dissuade the Edmonsons from filing further fraudulent returns rather than for future prosecutorial use. Because we conclude that the IRS letters weren't hearsay and weren't testimonial, we also conclude that their admission didn't run afoul of the Sixth Amendment. Thus, we affirm the district court's evidentiary ruling. See id.

*Prosecutorial Misconduct*

The Edmonsons next argue that they are entitled to a new trial because the prosecutor commented on their decision not to testify.[3]  But the prosecutor did not comment on their right to silence.

We analyze  preserved[4] allegations of prosecutorial misconduct under a "two-part test." United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir. 1990). We "assess (1) whether the challenged comments were improper and (2) if so, whether they prejudicially affected the substantial rights of the defendant." United States v. Campa, 529 F.3d 980, 997 (11th Cir. 2008).  We need not reach the second prong of this test here because the challenged comments were not improper.

A prosecutor's statement violates a defendant's right to silence if the statement "was manifestly intended to be a comment on the defendant's failure to testify," or "was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  United States v.

---

[3] Danielle's counsel objected to one of the comments at issue on burden shifting grounds, but the Edmonsons don't raise a burden shifting claim on appeal.  Thus, they have waived any issue regarding burden shifting.  See United States v. Higdon, 418 F.3d 1136, 1138 (11th Cir. 2005) (en banc) ("[I]ssues not raised in the opening brief are waived.").

[4] Although Danielle's counsel objected to the prosecutor's comments at issue, Kenneth's counsel did not.  We therefore review his claim of prosecutorial misconduct only for plain error. See United States v. Campa, 529 F.3d 980, 993 (11th Cir. 2008) ("Because only Campa challenged this evidence in the district court, we review the arguments of his codefendants for plain error."); House, 684 F.3d at 1197 ("[W]here a defendant fails to make a contemporaneous objection to the alleged misconduct in the district court, we review such claims for plain error."). Because we conclude as to Danielle's preserved claim that the prosecutor's comments weren't improper, Kenneth's unpreserved claim of prosecutorial misconduct necessarily fails as well.

16

Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005) (quotation omitted).  "Whether these conditions are satisfied can be determined only by examining the context in which the statement was made."  United States v. Flanders, 752 F.3d 1317, 1334 (11th Cir. 2014) (quotation omitted); see also United States v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must be examined in context").

Here, the prosecutor argued that if the Edmonsons had acted in good faith, they would have "just sen[t] a letter to the IRS" claiming they were owed money because of their "ancestry."  The prosecutor pointed out that their claimed belief that the "United States owe[d] them a debt" couldn't be reconciled with their use of fabricated tax forms.  These arguments didn't directly or indirectly comment on the Edmonsons' silence at trial.  Rather, they focused on the documents the Edmonsons filed with their returns and illustrated what they would have done had they sincerely believed their conduct was lawful.  Because it was not improper for the prosecutor to rebut the plausibility of the defense theory, there was no error.  See United States v. Exarhos, 135 F.3d 723, 728 (11th Cir. 1998) (explaining that the prosecutor did not comment on the defendant's silence by discussing "the quality (or lack thereof) of the defense's evidence and the defense's failure to rebut the necessary inferences created by the government's case.").

17

*The Jury Instructions*

The Edmonsons argue that the district court erred by not including the phrase "as alleged in the indictment" in the instructions explaining the elements of the offenses.  Kenneth also argues that the district court erred by including language in the making false, fictitious, or fraudulent claims instruction about third-party submission, and modifying the circuit's pattern good faith defense instruction.[5]  And Danielle argues that the district court erred by giving the aiding and abetting instruction.

## "As alleged in the indictment"

The Edmonsons argue that the district court erred by not adding the language "as alleged in the indictment" to the instructions explaining the elements of making false, fictitious, or fraudulent claims and mail fraud.  They argue that the absence of this language created the risk of a "variance" or "constructive amendment" because the jury could have convicted them of making fraudulent claims not specifically charged in the indictment.

---

[5] Kenneth notes that he objected to the district court giving the circuit's pattern reasonable doubt instruction—because it stated that the government didn't have to prove a defendant's guilt beyond all <u>possible</u> doubt—but doesn't provide any arguments or authorities to support this claim.  Because Kenneth has raised this issue "in a perfunctory manner without supporting arguments and authority," he has waived it.  <u>See</u> <u>Sapuppo v. Allstate Floridian Ins. Co.</u>, 739 F.3d 678, 681 (11th Cir. 2014).  And even if he hadn't waived it, "we have repeatedly approved of the definition of reasonable doubt provided in" the circuit's pattern instruction.  <u>United States v. James</u>, 642 F.3d 1333, 1337 (11th Cir. 2011).

18

"We will reverse a district court's refusal to give a requested jury instruction only if the proposed instruction correctly reflects the law, the jury instructions the district court actually gave did not address the proposed instruction, and the district court's refusal to give the requested instruction seriously impaired the defendant's ability to present an effective defense." United States v. Singer, 963 F.3d 1144, 1162 (11th Cir. 2020) (quotation omitted). Instructions "must be evaluated not in isolation but in the context of the entire charge." United States v. Gonzalez, 834 F.3d 1206, 1222 (11th Cir. 2016) (quoting Jones v. United States, 527 U.S. 373, 391 (1999)).

Here, the district court's charge—viewed as a whole—required the jury to consider only the conduct as alleged in the indictment. The district court instructed the jury that "[e]ach count of the indictment charges a separate crime" against the Edmonsons. The district court directed the jury to "consider each crime and the evidence relating to it separately." The district court cautioned that because "each defendant is on trial only for the specific crimes charged in the indictment," the jury had "to determine from the evidence in this case whether each defendant is guilty or not guilty of those specific crimes." And the district court gave the jury a copy of the indictment during its deliberations.

Thus, the district court's charge as a whole addressed the Edmonsons' proposed instructions. See Singer, 963 F.3d at 1162. The jury instructions did not create a risk of a variance or constructive amendment because the jury was told to

consider only the "specific crimes charged in the indictment" in assessing the Edmonsons' guilt. We therefore cannot conclude that the district court abused its discretion by refusing to give the Edmonsons' proposed instruction. See id.

### Third-Party Submission

Kenneth argues that the district court erred by instructing the jury on third-party submission because "a computer program is not a party." But Kenneth didn't object at trial to the third-party submission instruction on these grounds. The Edmonsons only argued there was no evidence of third-party submissions. Because Kenneth's arguments about third-party submission are made for the first time on appeal, we review them for plain error. See United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009) ("[J]ury instructions that are challenged for the first time on appeal are reviewed for plain error"); United States v. Wright, 392 F.3d 1269, 1277 (11th Cir. 2004) (explaining that plain error review applies where "the argument advanced at trial" challenging an instruction is not the argument "advance[d] on appeal").

An error is plain if it's "clear" or "obvious," United States v. Olano, 507 U.S. 725, 734 (1993)—that is, if "the explicit language of a statute or rule" or "precedent from the Supreme Court or this Court directly resolv[es]" the issue, United States v. Hesser, 800 F.3d 1310, 1325 (11th Cir. 2015) (quotation omitted). Kenneth has not pointed us to any statute, rule, or binding precedent establishing that the district court

20

erred by instructing the jury on third-party submission. And, in any event, the evidence showed that some of the Edmonsons' returns were electronically submitted to Intuit, a third-party tax preparer. Thus, Kenneth has not shown any error, much less plain error. See Hesser, 800 F.3d at 1325.

## Good Faith Defense

Kenneth argues that the district court erred by modifying the good faith defense instruction (modeled after the circuit's pattern special instruction 17) to state that "an act is not done in good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent." This language only applies, Kenneth argues, to business ventures. Kenneth maintains that the district court should have instead instructed the jury on the good faith defense using special instruction 9 because it was substantially correct, and the instruction given by the district court was confusing and impaired his ability to present his defense. His argument fails for two reasons.

First, Kenneth didn't ask the district court to give special instruction 9. During the charge conference, the Edmonsons requested that the district court give a good faith defense instruction "based off of" special instruction 17. Kenneth requested that the district court give special instruction 17 except for its last paragraph, which he argued was "inapplicable." The district court gave special instruction 17 but modified it as described above. Because Kenneth asked the district court to give

21

special instruction 17, he cannot now claim error arising from "the failure to give special instruction 9." The error, if any, was invited. See United States v. Harris, 443 F.3d 822, 823–24 (11th Cir. 2006) ("Where a party invites error, the Court is precluded from reviewing that error on appeal.").

Second, the good faith instruction given here accurately stated the defense. The good faith defense negates specific intent where a defendant has "a good-faith misunderstanding of the law or a good-faith belief that [he] is not violating the law[.]" United States v. Morris, 20 F.3d 1111, 1115 (11th Cir. 1994). The instruction that the good faith defense didn't apply if the Edmonsons "intended to deceive others by making representations [they] knew to be false or fraudulent" was an accurate statement of the law, because they couldn't have filed fraudulent returns with an intent to deceive and simultaneously had a good faith belief that they weren't violating the law. See id. Because the good faith instruction "accurately expresse[d] the applicable law," we have no basis to reverse. See Gonzalez, 834 F.3d at 1222.

## Aiding and Abetting

Danielle argues that the district court erred by instructing the jury on aiding and abetting liability. The instruction was unsupported by the evidence, she argues, because a person cannot aid a completed crime.

An aiding and abetting instruction is appropriate where there is proof that a defendant intentionally aided another person's commission of a crime. See United

22

States v. Seabrooks, 839 F.3d 1326, 1333 (11th Cir. 2016) ("[T]he trial evidence showed that Seabrooks aided Butler in [possessing a stolen firearm], thus authorizing the aiding and abetting instruction."). There was such evidence here. The Edmonsons lived together, had a joint bank account, and split the money they obtained in the course of their scheme. They also filed returns using the same uncommon tax forms, using the same fraudulent scheme, and their refund requests were often filed around the same time.

For example, Danielle filed in September 2017 a 1041 form (an income tax return for estates and trusts) representing that she had earned over four million dollars in interest from a trust. She requested a refund of almost two and a half million dollars. Kenneth also filed in September 2017 a 1041 form representing that he had earned over one million dollars in interest from a trust. He requested a refund of over seven hundred thousand dollars.

Because the jury could reasonably infer from this evidence that the Edmonsons jointly developed and executed their tax fraud scheme, the district court didn't err by giving the aiding and abetting instruction. See id.

*Competency*

Kenneth argues that the district court erred by not sua sponte ordering a hearing to evaluate his competency. He argues that his odd statements in court and his disruptive behavior created a bona fide doubt about his fitness to stand trial.

23

"Due process requires that a defendant not be made to stand trial for a criminal charge unless he is mentally competent." Fallada v. Dugger, 819 F.2d 1564, 1568 (11th Cir. 1987). A defendant is competent if he "has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding," and "has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). "[W]hen a court has a 'bona fide doubt' as to a defendant's competence, it must sua sponte conduct a hearing on his competence to stand trial." Fallada, 819 F.2d at 1568; see also 18 U.S.C. § 4241(a). In determining whether there was a bona fide doubt as to competency, we consider three factors: "(1) evidence of the defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial." Fallada, 819 F.2d at 1568.

Kenneth's arguments about his competency take his courtroom antics out of context. True, he said many odd things. Kenneth ranted about President Obama, the Pope, and the pharaohs, and claimed that he had been kidnapped. But these statements flowed from the same well: his belief that the district court lacked jurisdiction over him. See United States v. Sterling, 738 F.3d 228, 233 n.1 (11th Cir. 2013) (discussing the beliefs of "so-called 'sovereign citizens,'" who maintain the "frivolous" belief that "they are not subject to the jurisdiction of the courts"). Thus, although Kenneth claimed at times that he didn't understand the proceedings,

24

what he really didn't understand was—as he put it—"the authority" of the district court because he was a "Moor" and the district court therefore "[had] no jurisdiction" over him.

Viewed in context, Kenneth's statements, behavior, and demeanor weren't indications that he lacked a rational understanding about the proceedings; they were expressions of his quixotic beliefs about the district court's legitimacy. That didn't create a bona fide doubt about his competency. See United States v. Coleman, 871 F.3d 470, 477 (6th Cir. 2017) (holding that the defendant's "bizarre statements" and legal arguments, which "directly correspond[ed] to meritless rhetoric frequently espoused by tax protesters, sovereign citizens, and self-proclaimed Moorish-Americans," didn't require the district court to sua sponte order a competency hearing); United States v. James, 328 F.3d 953, 954–55 (7th Cir. 2003) (explaining that a competency hearing was unnecessary for a defendant whose defense was that "his ancestors came from Africa, that he is therefore a Moorish national, and that as a result he need obey only those laws mentioned in an ancient treaty between the United States and Morocco," because such beliefs didn't "imply mental instability").

There was also affirmative evidence that Kenneth had a rational understanding of the proceedings. At his initial appearance, he maintained that the charges were "just accusations," denied committing the offenses, and stated that he "underst[oo]d the accusation." Kenneth denied "suffering from any mental health

25

issues" and considered questions about his mental health "insulting." At trial, the district court asked Kenneth if he wished to testify and he "plead[ed] the Fifth," stating that he'd "rather remain silent." At sentencing, the district court told him about his right to make a statement and Kenneth replied that he "would like to exercise that right." And Kenneth's pre-scripted arguments about the district court's alleged lack of jurisdiction were themselves proof of his understanding. See Coleman, 871 F.3d at 477 ("That [d]efendant understood the criminal nature of the proceedings is reflected by the fact that he challenged the court's jurisdiction.").

Finally, nothing in the record gave rise to a bona fide doubt about Kenneth's ability to consult with his lawyer with a reasonable degree of rational understanding. Kenneth argues that he had "absolutely no ability to communicate and consult" with his attorney and "never even exchanged one word" with him. But "[r]efusing to work with defense counsel is not necessarily proof of incompetency because what matters is the ability to work with counsel." United States v. Cometa, 966 F.3d 1285, 1293 (11th Cir. 2020). Kenneth was adamant from the get-go that he would not "get in a contract with" the district court's "agents"—i.e., that he refused to accept the assistance of appointed counsel. Because the record establishes a refusal to work with counsel, rather than an inability, the district court had no reasonable grounds to sua sponte inquire into Kenneth's competency. See id.; 18 U.S.C. § 4241(a).

26

*Substitution of Counsel*

Kenneth finally argues that the district court erred by not sua sponte holding a hearing to determine if he wanted substitute counsel. Kenneth argues that a hearing was necessary because he didn't want to be represented by his appointed attorney and wouldn't communicate with him.

"Although the Sixth Amendment guarantees counsel, it does not grant defendants the unqualified right to counsel of their choice." United States v. Garey, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc). An indigent defendant may not "demand a different appointed lawyer except for good cause." Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985). "Good cause in this context means a fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." Garey, 540 F.3d at 1263 (quotation omitted).

Here, Kenneth never requested substitute counsel. He instead made clear at all times that he wished to represent himself. After the district court terminated his self-representation because of his obstructionism, Kenneth insisted that "no one will be representing me." At the status hearing shortly before trial, Kenneth declared that his appointed counsel didn't represent him. He maintained this position at trial. And at sentencing. Kenneth didn't want substitute counsel—he wanted no counsel.

27

And even if Kenneth had requested a new attorney, which he didn't, that request would have been futile; a defendant is "not entitled to unilaterally refuse to communicate with his appointed counsel and then seek new appointed counsel." United States v. Amede, 977 F.3d 1086, 1107 (11th Cir. 2020).  Thus, there was no need for the district court to inquire into whether Kenneth wanted substitute counsel.

## CONCLUSION

We find no error in the district court's patient and thorough handling of this case.  The Edmonsons' convictions and sentences are therefore **AFFIRMED.**