[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10532

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SERGE NKORINA,
a.k.a.
Sergei Nkorina,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:19-cr-20261-CMA-1

_____

Before JILL PRYOR, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

Following a jury trial, Serge Nkorina appeals his convictions for kidnapping and conspiracy to commit kidnapping and his sentence of 240 months' imprisonment, which were set forth in the district court's initial judgment. Nkorina timely appealed that judgment. After careful review, we affirm Nkorina's convictions and 240-month prison sentence.

However, the government argues that Nkorina failed to appeal timely the subsequent second amended judgment that added restitution. We agree and thus dismiss Nkorina's challenge to the district court's second amended judgment requiring him to pay $123,255 in restitution.

## I. PRETRIAL PROCEEDINGS

In 2019, a grand jury charged Nkorina and codefendant Justin Boccio with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (Count 1); kidnapping, in violation of 18 U.S.C. § 1201(a)(1) (Count 2); and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 3). The government later dismissed Count 3.

Codefendant Boccio pled guilty to Counts 1 and 2. Boccio's written plea agreement provided that he would continue to

cooperate with the government in its investigation, including testifying.

Nkorina, through counsel, pled not guilty and proceeded to trial. Subsequently, Nkorina requested to have his counsel replaced. After conducting a thorough *Faretta*[1] inquiry, the district court permitted Nkorina to represent himself at trial with standby counsel present.

Before trial, the government filed a witness list that included "James Kelley, FBI." Nkorina's standby counsel then filed a witness list of his own, which "Adopt[ed] Any and All Government Subpoenas and/or Called Witnesses" and named two additional witnesses.

Nkorina's standby counsel also moved for a jury instruction on the "lesser included offense" of burglary. Nkorina's standby counsel suggested that "there may likely be evidence" that he did not participate in, nor have knowledge of, the crimes charged but was instead "present for an attempted burglary." Nkorina's proposed jury instruction included language from 18 U.S.C. § 2115, which criminalizes breaking into a post office, and 10 U.S.C. § 929, which defines burglary for purposes of the Uniform Code of Military Justice.

---

[1] *Faretta v. California*, 422 U.S. 806 (1975).

## II. TRIAL EVIDENCE

### A. The Plan to Kidnap Dr. Shehata

At trial, the government called codefendant Boccio, who testified about most of Nkorina's participation in the kidnapping crimes. The government also presented a wealth of physical evidence, video surveillance footage, and other forensic evidence connecting Nkorina to the kidnapping crimes. We recount the trial evidence.[2]

In October 2018, both Boccio and Nkorina were unemployed. Nkorina lived in Tenerife, Spain, but owned a condominium in Margate, Florida, which he intended to sell in late 2018. In November 2018, Nkorina traveled to Florida with plans to stay with Boccio in Boccio's apartment until his condo sold. In preparation for selling the condo, Boccio helped Nkorina pack and move some of the belongings from Nkorina's condo to a self-storage unit.

Because Nkorina and Boccio were unemployed, they needed money. In December 2018, Nkorina told Boccio "he knew someone who had money, and he knew how to get it."

Nkorina and Boccio hatched a plan to kidnap Dr. Nader Shehata. Dr. Shehata was a cosmetic doctor in East Hallandale,

---

[2] We view all evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict. *See United States v. Maradiaga*, 987 F.3d 1315, 1321 (11th Cir. 2021).

22-10532          Opinion of the Court          5

Florida, who treated Nkorina's wife in 2015 and 2016.[3] Nkorina and Boccio planned to take Dr. Shehata to a secondary location, where they "intended on beating him up" to get information from him. They decided to take Dr. Shehata to a storage unit in the same facility Nkorina used to store items from his condo.

In preparation for the kidnapping, Nkorina obtained Dr. Shehata's asset report, allegedly to sue him for botched plastic surgeries. Nkorina also obtained Dr. Shehata's credit report, which detailed where Dr. Shehata lived, the car he drove, and where he worked.

To track Dr. Shehata's movements, Nkorina and Boccio purchased a GPS tracking device. Nkorina and Boccio, driving Nkorina's car, pulled up behind Dr. Shehata's car, which was parked outside Dr. Shehata's clinic. Nkorina got out of his car, placed the tracking device beneath the rear of Dr. Shehata's car, and then got back in his own car and drove away.

Between December 30, 2018 and January 8, 2019, Nkorina and Boccio bought several items from Home Depot, including zip ties, duct tape, nails, a hammer, a shovel, a sledgehammer, a blowtorch, a chair, and jumpsuits. Some of these items were used for "intimidation," and others were used "to extract information." Nkorina and Boccio also bought hard hats, construction safety

---

[3] Dr. Shehata passed away from COVID-19 before trial and thus did not testify. [**Doc. 235 at 86-87**]

vests, and construction cones to potentially disguise themselves as construction workers and "grab [Dr. Shehata] on the street."

Nkorina and Boccio went to a medical supply store to buy masks, latex gloves, and ammonia sticks. The ammonia sticks were to be used to wake Dr. Shehata if he passed out "[f]rom pain or from fear." Nkorina and Boccio also bought prepaid phones and phone cards at Walmart. Nkorina and Boccio drove Nkorina's car to Walmart to buy the phones.

On January 5, 2019, Nkorina and Boccio rented a van to kidnap Dr. Shehata. Over the following days, Nkorina and Boccio used the van to stalk Dr. Shehata. They often sat in the van outside Dr. Shehata's clinic for at least half an hour. Boccio, using a fake name, eventually made a consultation appointment with Dr. Shehata for January 14, 2019.

## B. The Kidnapping

On January 14, Nkorina drove Boccio to Dr. Shehata's office in the rented van. If fewer than a dozen people were inside the office, Boccio planned to call Nkorina, who would enter armed, take hostages if necessary, and extract Dr. Shehata.

When Boccio entered, he observed that there were fewer than 12 people in the office. However, Boccio "couldn't bring [him]self to do it," so he decided to leave the appointment and tell Nkorina that there were more than 12 people inside. Nevertheless, Boccio confirmed to Nkorina that Dr. Shehata was present.

For the rest of the day, Nkorina and Boccio watched the office from the van. When Dr. Shehata left the office, Nkorina and Boccio followed him to a pharmacy and then to a Walmart. Nkorina and Boccio watched Dr. Shehata enter the Walmart, and they parked the van directly adjacent to Dr. Shehata's car in the Walmart parking lot.

About an hour later, Dr. Shehata returned from the store and loaded groceries into his car. Nkorina and Boccio waited as Dr. Shehata returned his empty shopping cart to the store. In the meantime, Nkorina positioned himself between the van and Dr. Shehata's car so he could obstruct Dr. Shehata's path to the driver's seat of his car.

When Dr. Shehata returned, Nkorina, wearing the construction vest, got Dr. Shehata's attention, tased him, and threw him into the back of the van. Nkorina then ran to the driver's seat of the van to drive away, while Boccio squatted in the back of the van with Dr. Shehata. Boccio zip-tied Dr. Shehata's legs, while Nkorina drove the van to the storage facility.

Inside the storage unit, Nkorina and Boccio zip-tied Dr. Shehata's arms and legs to the chair to begin extracting information from him. To conceal their faces from Dr. Shehata, Nkorina and Boccio wore headlamps with the lights pointed right at Dr. Shehata's face. They also put a 1,000 watt light bulb right in front of the chair Dr. Shehata was seated in.

About five minutes later, Boccio left the storage unit and drove the van to the Cheetah Gentleman's Club, a strip club where

Nkorina previously worked as a security officer (hereinafter, the "strip club").  Boccio then took a rideshare from the strip club to Walmart, picked up Dr. Shehata's car, and drove it back to the strip club.  Boccio stashed Dr. Shehata's car at the strip club because Nkorina knew a spot that was out of sight from security cameras.

By the time Boccio in the van returned to the storage unit, Nkorina had been alone with Dr. Shehata for over an hour.  Dr. Shehata's face and mouth were swollen, and he was bleeding from his mouth and nose.  Boccio witnessed Nkorina ask Dr. Shehata about the code to his gated community, punch Dr. Shehata in the face a few times, and use the blowtorch to heat up a pair of metal shears, which he held to Dr. Shehata's skin.

Dr. Shehata eventually passed out, but Nkorina and Boccio used the ammonia sticks to wake him up.  Nkorina and Boccio forced Dr. Shehata to drink several mouthfuls of wine that they spiked with cocaine, hoping that when Dr. Shehata was found by police, any statement he made would be "inadmissible."  At some point, Dr. Shehata revealed that he had $100,000 in his house and that no one was home.

After about another hour and a half in the storage unit, Nkorina and Boccio drove the van back to the strip club with Dr. Shehata in the van.  When they arrived, Nkorina and Boccio moved the groceries from the trunk of Dr. Shehata's car to the front seat of his car so they could collapse the rear seats and put Dr. Shehata in the rear of the car.  Nkorina and Boccio then left the

strip club in both vehicles.  Nkorina and Boccio dropped the van off at a parking lot and then drove Dr. Shehata's car to his house.

Shortly before 2:00 a.m. on January 15, Nkorina and Boccio arrived at Dr. Shehata's subdivision and observed several cars in Dr. Shehata's driveway.  Nkorina and Boccio in Dr. Shehata's car quickly drove away and pulled over on a nearby street.  Thinking that Dr. Shehata had lied about nobody being home, Nkorina yelled at Dr. Shehata to tell him if anybody was home.  Eventually, Nkorina and Boccio went back to Dr. Shehata's house and pulled into the driveway.  Nkorina got out of the car and approached the front door with a handgun.  At this point, Dr. Shehata was still "laid down in the back of his car."

At 2:01 a.m., Dr. Shehata's wife, Genfeaf Mikhail, who was away in Orlando, received a notification on her phone from the Ring doorbell camera at her house.  The Ring camera captured a video of a stranger with a gun at the door of the house.  Mikhail called her neighbor and asked the neighbor to call the police. During Nkorina's cross-examination of Genfeaf Mikhail, Nkorina identified himself as "the guy who was at your door on the doorbell camera.  That's me."

Nkorina quickly returned to Dr. Shehata's car after seeing a light go on inside the house, and Nkorina and Boccio left.  Nkorina and Boccio later returned in Dr. Shehata's car to the house, but they saw a sheriff's car in the subdivision and "assumed that the plan was a lost cause."  Nkorina and Boccio returned to the strip

club with Dr. Shehata, who was still awake in the rear of his car at this point.

When they got to the strip club, Nkorina and Boccio spread cocaine inside Dr. Shehata's car "to discredit his statement later on." They also placed a vial of lipstick, a wine glass, and a bottle of wine in Dr. Shehata's car. At 2:53 a.m., Nkorina and Boccio left Dr. Shehata at the strip club lying on his side in the rear of his car with the rear seats laying down.

The next day, January 15, Nkorina and Boccio cleaned the storage unit and returned the rented van. They also returned many of the items they bought from Home Depot in exchange for store credit. They vacated the storage unit, and Nkorina sold his handgun.

In February 2019, Nkorina left Boccio's apartment and returned to Spain, with both men thinking they had gotten away with the crime. Nkorina left his car at a former coworker's house.

## C. The Investigation

Around 3:00 or 4:00 a.m. on January 15, an off-duty police officer working at the strip club found Dr. Shehata in his car. Dr. Shehata's hands and feet were zip-tied, he had visible burn marks on his hands and scratches on his face, and he appeared "very disheveled."

In April 2019, FBI agents arrested Boccio and searched his apartment pursuant to a search warrant. The agents discovered ammunition, duct tape, shears, a screwdriver, a hard hat, zip ties,

ammonia inhalants, masks, construction vests, traffic cones, a Home Depot card, a Walmart receipt dated 6:26 p.m. on January 14, 2019, and Dr. Shehata's asset report.

During his trial testimony, Boccio admitted that he lied to FBI agents during their initial interrogation of him. Specifically, Boccio told the FBI that Nkorina coerced him by holding a gun to his head, that a third party was involved, and that he knew nothing about the wine in Dr. Shehata's car. On cross-examination, Boccio confirmed that he lied because he "wasn't willing to accept [his] own responsibility." Boccio testified that he was not lying at trial, as he "would not perjure [himself] to risk spending more time in prison." Boccio also explained that he hoped to receive a sentence reduction for cooperating with the government, but he had not been promised anything.

On May 7 and 8, 2019, the FBI also executed a warrant to search Nkorina's car left at his former coworker's house. FBI agents found handgun cartridges, a GPS tracking device, a card used to load minutes on a burner phone, a Home Depot gift card, the van rental agreement in Boccio's name, a blowtorch, and duct tape.

The investigation uncovered surveillance footage from the video security system outside of Dr. Shehata's office. Surveillance footage from January 8, 10, 12, and 14, 2019 showed a silver van in the parking lot outside Dr. Shehata's office. The footage showed no one leaving the van to do any business. Notably, the footage

from January 14 also showed Dr. Shehata's car leaving his office around 5:30 p.m., with the silver van pulling out right behind him.

Surveillance cameras at Walmart captured, on January 14, 2019, a man pulling a shopping cart and loading items into a car. The footage showed the man returning the shopping cart towards the curb. There was then a "scuffle" between the man and another man in a safety vest, with the man in the safety vest ultimately putting the other man into a van. Surveillance footage from outside the strip club showed Nkorina and Boccio moving the groceries from the trunk of Dr. Shehata's car to the front of that car, collapsing the rear seats of the car, placing Dr. Shehata in the rear of the car, and driving away. Additionally, security cameras at Home Depot showed Nkorina and Boccio purchasing items on December 30 and 31, 2018, and January 4, 6, and 8, 2019, and returning the items on January 17, 2019.

Forensic examiners with the FBI found Nkorina's fingerprints on several items recovered from Boccio's apartment, including Dr. Shehata's asset report, a bag of zip ties, and the ammunition. Nkorina's DNA also was linked to samples taken from the wine bottle in Dr. Shehata's car.

The FBI obtained cell site data for Nkorina's, Boccio's, and Dr. Shehata's cell phones. Cell phones attributed to Nkorina and Boccio utilized cell towers close to the rental car location of the van rental on January 5, 2019, the Home Depot on January 8 and 9, 2019, Dr. Shehata's office on January 12, 2019, and that rental car location again on January 15, 2019. Dr. Shehata's cell phone used

cell towers close to both the Walmart and the strip club on January 14, 2019.

Nkorina was arrested in Spain and extradited to Miami. While FBI agents were transporting Nkorina from the airport, Nkorina spontaneously stated that (1) "he never thought he would be back in Miami"; (2) "his friend had approached him and said that he needed money"; (3) "he thought the idea was crazy and that they would never get away with it, but he couldn't say no to his friend"; and (4) "his friend had been arrested and was talking with the police and was switching things around to make it seem like it was his idea."

**D. Nkorina's Motion for Acquittal**

At the close of the government's evidence, Nkorina's standby counsel moved for a judgment of acquittal, "particularly on the issue of the commerce clause, the third element in the jury instructions." The government responded that the asset report was sent through U.S. mail and that Nkorina and Boccio used cell phones and drove on the interstate. The district court denied the motion as to the commerce clause issue.

Nkorina personally argued for acquittal on the basis that the indictment was fraudulent because the signature on it was forged. Nkorina also reiterated that "[t]he victim has been released within 24 hours and ha[s not] crossed any state line, nothing has been used across state line[s]."

Nkorina did not move for acquittal on the general basis that the evidence was insufficient to support the charges. The district court denied Nkorina's motion for acquittal.

### E. Nkorina's Defense Case

During Nkorina's defense case, Nkorina attempted to call Special Agent Kelley of the FBI, who was on the government's witness list but was not called by the government to testify. Nkorina explained that he wanted to call Agent Kelley because Agent Kelley took Boccio's statement when the FBI searched Boccio's apartment. The government responded that Agent Kelley was on leave after having surgery and his whereabouts were unknown.

The district court confirmed that Nkorina did not have Agent Kelley under subpoena. The district court then explained that Agent Kelley's inclusion on the government's witness list did not mean he had to be there. The district court told Nkorina "[t]here is nothing I can do."

Nkorina then took the stand to testify. Nkorina testified that Boccio was "broke" and asked Nkorina to help him. Nkorina attempted to provide these explanations for much of the physical evidence used during the kidnapping. Nkorina and Boccio bought items such as the zip ties, masks, gloves, construction vests and traffic cones to help Boccio get a job working in construction. The ammonia sticks were used by Boccio to clear his nose because of his cocaine usage. Nkorina intended to use the blowtorch to apply heat to a rusty bolt on Boccio's car. The GPS tracker was to be

used by Boccio to spy on his wife.  As for why he obtained Dr. Shehata's asset report, Nkorina claimed (without any proof) that the Cheetah Gentleman's Club where he worked often had problems with clients who failed to pay back credit that the club provided.

Nkorina explained that he approached Dr. Shehata's house because he "needed to see what those locks looks like" to help Boccio with his idea "maybe—and, again, maybe—to gain entry to this house."  Nkorina did not go inside the house because he "didn't have to" and "[o]therwise, this will be an attempt."  Nkorina had a gun with him for his own safety because people in the neighborhood might have had dogs.

Before the government cross-examined Nkorina, the district court asked Nkorina if he had any other witnesses to call.  Standby counsel stated that there were no further witnesses except Agent Kelley, but "the Court has already ruled" on that issue.  The district court stated that it had not ruled on anything but "[i]f he's not here, he's not here. . . . Certainly if he's here and you can get him here, he'll testify."  Agent Kelley ultimately did not appear or testify.

## F. Nkorina's Proposed Jury Instruction

After Nkorina rested, the district court elicited argument on Nkorina's motion for a jury instruction on burglary as a lesser included offense.  Standby counsel argued that Nkorina was not involved in the kidnapping but instead at most went to burglarize Dr. Shehata's house.  Standby counsel admitted that burglary was

not a lesser included offense of kidnapping but asserted that it was a "lesser and separate offense."

The district court denied the motion for a burglary instruction, finding that the elements of burglary and kidnapping were "totally separate" and if "this whole thing was merely a robbery, then [Nkorina is] going to be found not guilty." Standby counsel also renewed the motion for judgment of acquittal on commerce clause grounds, but the district court denied that motion too.

The jury ultimately found Nkorina guilty of the kidnapping crimes in both Counts 1 and 2.

## III. SENTENCING AND RESTITUTION

### A. Presentence Investigation Report

A probation officer prepared a presentence investigation report ("PSI") that calculated a total offense level of 36 consisting of: (1) a base offense level of 32 under U.S.S.G. § 2A4.1(a); (2) a two-level increase under U.S.S.G. § 2A4.1(b)(2)(B) because the victim sustained serious bodily injury; and (3) a two-level increase under U.S.S.G. § 2A4.1(b)(3) because Nkorina used a dangerous weapon. Nkorina's criminal history category was I. A total offense level of 36 and a criminal history category of I resulted in an advisory guidelines imprisonment range of 188 to 235 months.

The government objected to the PSI's failure to include a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1. The government argued that Nkorina obstructed justice by

committing perjury during his testimony at trial. Nkorina, through standby counsel, opposed the government's objection.

The probation officer subsequently filed a revised PSI that included the two-level increase for obstruction of justice, resulting in a total offense level of 38, a criminal history category of I, and a revised advisory guidelines range of 235 to 293 months' imprisonment.

## B. Sentencing Hearing

At sentencing, the district court agreed with the government that the obstruction of justice increase was warranted. The district court read excerpts from the notes it took during trial, which reflected what it "was thinking at the time during Mr. Nkorina's testimony." The district court observed that Nkorina's testimony was "[o]ne of the most egregious cases of perjury" and that he did not know where to begin. The district court highlighted Nkorina's explanations for the physical evidence used during the kidnapping and noted that "the jurors physically reflected disbelief, raising their eyebrows." The district court observed that Nkorina's testimony was "unbelievable" and "in conflict with government's evidence, much of which was unrefuted."

Based on its notes, the district court found that it was "very clear" that Nkorina "was testifying falsely." The district court explained that "it appeared to me [Nkorina] thought maybe he could just, through sheer personality, sway this jury." The district court further stated that "when you give perjured testimony, that hinders the process." The district court therefore upheld the

two-level increase and found that the advisory guidelines imprisonment range was 235 to 293 months.

The district court ultimately sentenced Nkorina to 240 months' imprisonment on Counts 1 and 2, to be served concurrently. The district court also ordered Nkorina to pay restitution in an amount to be determined at a later date.

On February 18, 2022, the district court entered a judgment finding Nkorina guilty of Counts 1 and 2 and imposing a 240-month imprisonment sentence. The judgment listed the restitution amount as "TBD." The same day, February 18, 2022, Nkorina filed a notice of appeal.

On March 2, 2022, the district court amended that original judgment to add that the government dismissed Count 3.

## C. Restitution and Second Amended Judgment

Subsequently, on June 9, 2022, the district court held a restitution hearing. The government sought restitution in the amount of $123,255, consisting of $63,818 in medical bills and $59,437 in lost wages. Nkorina objected to any restitution. The district court ultimately ordered restitution in the amount of $123,255, as requested by the government.

On July 29, 2022, the district court entered a second amended judgment that included restitution of $123,255. Nkorina did not file a new or amended notice of appeal from the second amended judgment.

## IV. STANDARDS OF REVIEW

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Macrina*, 109 F.4th 1341, 1347 (11th Cir. 2024). We also review the district court's refusal to give a jury instruction for abuse of discretion. *Id.*

Typically, we review *de novo* a challenge to the sufficiency of the evidence, viewing all evidence and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Maradiaga*, 987 F.3d 1315, 1321 (11th Cir. 2021).

Here, the government asserts that Nkorina did not adequately preserve an objection to the sufficiency of the evidence for his convictions, and thus, plain error review applies on appeal. Under plain error review, a defendant must show "(1) an error, (2) that is plain, and (3) that affected his substantial rights." *United States v. Harris*, 7 F.4th 1276, 1285 (11th Cir. 2021). If a defendant does so, then we may exercise our discretion to recognize the error "if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

When reviewing a district court's application of a sentencing enhancement for obstruction of justice, we "review the district court's factual findings for clear error and its application of those facts to the Sentencing Guidelines *de novo*." *United States v. Singer*, 963 F.3d 1144, 1164 (11th Cir. 2020).

## V. DISCUSSION

### A. Agent Kelley's Absence From Trial

On appeal, Nkorina begins by arguing that his inability to call FBI Agent Kelley violated due process. Nkorina asserts that his witness list adopted the government's list, which was "synonymous for purposes of issuing a subpoena to a government witness." We disagree.

No error stems from Agent Kelley's absence from trial. Nkorina never subpoenaed Agent Kelley, never moved the district court for a subpoena at the government's expense, and never moved for a continuance so he could subpoena or secure Agent Kelley's appearance. The district court never prevented Agent Kelley from testifying and even made clear that if Nkorina could "get him here, he'll testify."

Contrary to Nkorina's contentions, the government's witness list did not function as a subpoena. Subpoenas must "include the seal of the court" and "command the witness to attend and testify at the time and place the subpoena specifies." Fed. R. Crim. P. 17(a). The government's witness list did neither of these things. And in any event, Nkorina's witness list adopted only the "Government Subpoenas and/or Called Witnesses." The government did not subpoena or call Agent Kelley.

### B. The Jury Instruction on Burglary

Nkorina also contends that he was entitled to a jury instruction on burglary as a lesser included offense. Nkorina points

to his trial testimony that he participated in only a burglary at Dr. Shehata's house and had no involvement in the kidnapping. Nkorina asserts that without a burglary instruction, the jury was left with no lawful explanation for his conduct other than to find him guilty of kidnapping.

To establish that a district court's failure to give a requested jury instruction constituted reversible error, a defendant must show that the requested instruction "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." *United States v. Westry*, 524 F.3d 1198, 1216 (11th Cir. 2008) (quotation marks omitted). To support a jury instruction on a lesser included offense, a defendant must show that "the charged offense encompasses all of the elements of the lesser offense" and that "the evidence would permit the jury rationally to acquit the defendant of the greater, charged offense and convict him of the lesser." *United States v. Whitman*, 887 F.3d 1240, 1246 (11th Cir. 2018) (quotation marks omitted).

The district court did not abuse its discretion in denying Nkorina's request for a jury instruction on burglary. Nkorina's proposed jury instruction included language from two statutes: 18 U.S.C. § 2115 and 10 U.S.C. § 929. To prove burglary under § 2115, the government must show that the defendant forcibly broke into or attempted to break *into a post office* with intent to commit

larceny or other depredation. *See* 18 U.S.C. § 2115. To prove burglary under § 929,[4] the government must show that the defendant broke and entered *into the building or structure of another*. *See* 10 U.S.C. § 929. In contrast, to prove kidnapping, the government must show that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held *a person*. *See* 18 U.S.C. § 1201(a).

Nkorina does not identify a single element of burglary that is "encompasse[d]" within a kidnapping charge, let alone "all" of them. *See Whitman*, 887 F.3d at 1246. Patently, burglary is not a lesser included offense of kidnapping.

It was also not necessary, much less required, for the district court to instruct the jury on burglary as a "separate" offense. As the district court pointed out, if the jury believed that Nkorina merely burglarized Dr. Shehata's house and did not kidnap Dr. Shehata, then it would have acquitted Nkorina of the charged kidnapping. In any event, at trial, Nkorina testified that he did *not* attempt to burglarize Dr. Shehata's house and went there only to see what the locks looked like for a possible future attempt. Simply put, there is no evidence that the absence of a burglary instruction impaired Nkorina's "ability to present a defense" to the two kidnapping crimes because he did not argue, as a defense, that he

---

[4] As noted earlier, § 929 defines burglary for purposes of the Uniform Code of Military Justice.

committed attempted burglary instead of kidnapping. *See Westry*, 524 F.3d at 1216.

## C. Sufficiency of the Evidence

Nkorina also challenges the sufficiency of the evidence to support his convictions. He specifically argues that (1) Boccio was the only witness who testified that Nkorina was involved in all aspects of the kidnapping conspiracy, (2) Boccio was not credible because he was testifying under a cooperation agreement, and (3) detention of a person (Dr. Shehata) does not always rise to the level of a "true" kidnapping.

As noted above, the federal kidnapping statute involves a person and has two elements: "(1) unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away the victim; and (2) holding the victim for ransom or reward or otherwise." *United States v. Gillis*, 938 F.3d 1181, 1203 (11th Cir. 2019); *see also* 18 U.S.C. § 1201(a). The federal kidnapping statute also criminalizes conspiring to commit kidnapping. 18 U.S.C. § 1201(c). To establish a conspiracy, the government must prove "(1) [an] agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." *United States v. Estepa*, 998 F.3d 898, 908-09 (11th Cir. 2021) (quotation marks omitted).

In the district court, Nkorina moved for judgment of acquittal emphasizing two specific grounds: the commerce clause and the forged signature on the indictment. Here, Nkorina

switches to an overall "general" challenge to the sufficiency of the evidence to support his convictions. *See United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016) (providing that when a defendant raises specific challenges to the sufficiency of the evidence below that are different than the challenges raised on appeal, we review the challenge for plain error). On the other hand, Nkorina and his standby counsel did at least move for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. We need not decide the proper standard of review because even under *de novo* review, Nkorina's challenge fails.

As recounted above, the evidence is more than sufficient to support Nkorina's conspiracy to commit kidnapping and substantive kidnapping convictions. Based on the trial evidence, a reasonable jury could easily find beyond a reasonable doubt that Nkorina knowingly and voluntarily conspired to unlawfully seize and hold Dr. Shehata for ransom and did in fact seize and hold him. *See* 18 U.S.C. § 1201(a), (c).

Regarding Boccio's credibility, Boccio admitted that he initially lied to the FBI and was cooperating with the government in the hopes of receiving a reduced sentence. Nkorina cross-examined him on these points. Furthermore, Boccio's testimony was consistent with certain physical evidence found in Boccio's apartment and Nkorina's car, the surveillance footage,

and the forensic evidence connecting Nkorina to the crime. The jury was free to draw its own conclusions about Boccio's credibility and did so.

In addition, a reasonable jury could find that Nkorina's detention of Dr. Shehata was a "true" kidnapping. The jury heard Boccio testify that Nkorina abducted Dr. Shehata by tasing him, held Dr. Shehata by force in the storage unit, and tortured Dr. Shehata until he revealed that he had $100,000 in his house. This testimony aligns directly with the two elements of the federal kidnapping statute. *See Gillis*, 938 F.3d at 1203.

Moreover, Nkorina elected to take the stand and testify in his defense. Generally, a defendant's testimony denying guilt, if disbelieved by the jury, may be considered as substantive evidence of guilt. *See United States v. Brown*, 53 F.3d 312, 314-15 (11th Cir. 1995). At trial, Nkorina admitted that (1) he possessed the physical evidence used during the kidnapping, including the zip ties, masks, gloves, construction vests, traffic cones, ammonia sticks, blowtorch, and GPS tracker; (2) he possessed Dr. Shehata's asset report; and (3) he went to Dr. Shehata's house and approached the front door while carrying a gun. The jury was free to disbelieve Nkorina's purported explanations for his conduct and consider this testimony as evidence of Nkorina's guilt.

In sum, ample evidence supported Nkorina's convictions. Thus, Nkorina has shown no error, much less plain error, in the district court's denial of Nkorina's motion for judgment of acquittal. We therefore affirm Nkorina's two convictions.

**D. Sentence: Obstruction of Justice U.S.S.G. § 3C1.1**

Turning to his 240-month prison sentence, Nkorina challenges the district court's application of the two-level increase under U.S.S.G. § 3C1.1 for obstruction of justice based on his perjured testimony. Nkorina asserts that the increase is not to be applied simply when a defendant exercises his right to testify at trial and is found guilty.

Under the Sentencing Guidelines, a defendant's offense level is increased by two levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1.

"A court may apply the obstruction enhancement where the defendant testifies on his own behalf and perjures himself while doing so." *Singer*, 963 F.3d at 1164. For purposes of the obstruction of justice enhancement, perjury is "false testimony concerning a material matter with the willful intent to provide false testimony." *Id.* (quotation marks omitted). Materially false information is defined as "information that, if believed, would tend to influence or affect the issue under determination." *Id.* at 1165 (quotation marks omitted) (citing U.S.S.G. § 3C1.1 cmt. n.6).

Generally, application of the obstruction of justice increase requires the district court to "make an independent factual finding that the defendant gave perjured testimony on a material matter." *Id.* (quotation marks omitted). "Although it is preferable that the district court make specific findings by identifying the materially false statements individually, it is sufficient if the court makes a general finding of obstruction encompassing all the factual predicates of perjury." *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (quotation marks omitted).

Here, the district court appropriately applied the obstruction of justice increase based on its finding that Nkorina gave perjured testimony at trial. The district court explicitly highlighted Nkorina's "unbelievable" explanations for the physical evidence used during the kidnapping. The district court even found that Nkorina's testimony was "[o]ne of the most egregious cases of perjury" and that it was "very clear" that Nkorina "was testifying falsely."

Although the district court never specifically isolated a specific materially false statement, the district court not only found Nkorina's explanations for the physical evidence in his possession false but also made a more than sufficient "general finding of obstruction encompassing all the factual predicates of perjury." *Id.* Indeed, the district court expressly stated that Nkorina gave perjured testimony. The district court noted that Nkorina "thought maybe he could just, through sheer personality, sway this jury," suggesting that the court believed Nkorina's testimony was

willful.  *See Singer*, 963 F.3d at 1164.  And Nkorina's testimony was material because it went directly to whether he knowingly participated in a conspiracy to kidnap Dr. Shehata.  *See id.* at 1165.

Accordingly, we affirm the district court's application of the § 3C1.1 obstruction of justice increase and Nkorina's 240-month prison sentence.

## E. Restitution

Lastly, Nkorina challenges the district court's $123,255 restitution award on the basis that the government did not timely provide him documents supporting its requested restitution amounts.  The government points out that Nkorina did not appeal the July 29, 2022 second amended judgment containing the restitution amount.

A judgment that imposes a prison sentence and an unspecified amount of restitution is final and can be immediately appealed.  *United States v. Muzio*, 757 F.3d 1243, 1250 (11th Cir. 2014).  In this situation, a defendant may either (1) timely appeal from the initial judgment and subsequently appeal the later judgment finalizing the restitution amount, or (2) timely appeal from the subsequent judgment only.  *Id.* at 1250 n.9.

However, if a defendant files only a single notice of appeal between the initial judgment and the subsequent judgment, and the government objects to the defendant's failure to file a new or amended notice of appeal following the subsequent judgment, then the defendant may not challenge the restitution amount determined in the subsequent judgment.  *Manrique v. United States*,

581 U.S. 116, 118 (2017).  This requirement is "at least a mandatory claim-processing rule," meaning that when the government timely raises the issue, "the court's duty to dismiss the appeal [is] mandatory." *Id*. at 121-22.

Here, Nkorina timely appealed the district court's initial judgment (dated February 18, 2022), which left the amount of restitution to be determined at a later date, on February 18, 2022. The district court entered a second amended judgment (dated July 29, 2022) setting forth the $123,255 restitution amount.  But Nkorina did not file a new or amended notice of appeal following entry of the second amended judgment.  Because the government has objected to Nkorina's failure to appeal the second amended judgment, we must dismiss Nkorina's restitution claim in this appeal. *See id*. at 118, 121-22.

## VI. CONCLUSION

We affirm Nkorina's convictions on Counts 1 and 2.  We also affirm Nkorina's 240-month prison sentence and dismiss Nkorina's restitution claim in this appeal.

**AFFIRMED IN PART AND DISMISSED IN PART.**